## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| 10X GENOMICS, INC. and<br>PROGNOSYS BIOSCIENCES, INC., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Civil Action No. 21-cv-653-MFK |
| | ) | |
| NANOSTRING<br>TECHNOLOGIES, INC., | ) | |
| | ) | |
| Defendant. | ) | |

### MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

10x Genomics, Inc. and Prognosys Biosciences, Inc. (collectively 10x) have sued

NanoString Technologies, Inc. for infringement of eight patents:  United States Patent

Nos. 10,472,669 (the '669 patent); 10,662,467 (the '467 patent); 10,961,566 (the '566

patent); 10,983,113 (the '113 patent); 10,996,219 (the '219 patent); 11,001,878 (the '878

patent); 11,008,607 (the '607 patent); and 11,293,917 (the '917 patent).  10x contends

that NanoString's GeoMx Digital Spatial Profiler infringes numerous claims of the

asserted patents.[1]  Seven of those claim terms are in dispute and must now be

construed.[2]  In this opinion, the Court sets forth its construction of the disputed claim

---

[1] 10x contends that NanoString infringes claim 1 of the '669 patent; claim 1 of the '467
patent; claims 1 and 28 of the '566 patent; claim 1 of the '113 patent; claim 1 of the '219
patent; claim 1 of the '878 patent; claims 1 and 3 of the '607 patent; and claim 1 of the
'917 patent.
[2] The parties have agreed that the term "portion of the tissue sample" in claim 1 of the
'917 patent should be given its plain and ordinary meaning, such that a "portion of the
tissue sample" is not limited to a "probe" or "probes," but encompasses any part or
component of the tissue sample.

terms.

## Background

### A.        Overview of the technology

10x and NanoString are biotechnology companies that offer tools for studying genetic material on a cellular level.  More specifically, they have both innovated solutions for understanding how different cellular regions of a particular biological tissue sample are behaving.  10x owns and/or licenses several patents pertaining to spatial analysis and next generation sequencing (NGS)[3], which refer to analyzing intact pieces of tissue and correlating genetic information with specific locations in the tissue. Creating a high-resolution spatial map of a tissue sample involves introducing to a tissue sample reagents that bond together with complementary DNA or RNA molecules or proteins that can later be decoded through a sequencing process.  This encoding scheme allows target genes or proteins to be correlated to their locations in the tissue. Studying gene expression at different regions of a tissue sample, or mapping the gene expression in a tissue sample, may help scientists better understand the biology of the tissue.  Spatial analysis is therefore commonly used in oncology, immunology, and neurology to identify genes and observe changes in gene expression.

### B.        The accused product

The accused product in this case is NanoString's GeoMX Digital Spatial Profiler. NanoString contends that, unlike the technology taught in the patents, its products do not use probes containing spatial information, or a spatial patterning method at all, "but

---

[3] The key feature of NGS is multiplexing, which is the ability to simultaneously analyze multiple things in a single text (e.g., several different biological targets).

rather apply reagents to the surface of tissue indiscriminately, like a blizzard."  Joint Claim Constr. Br. at 1.  NanoString also contends that, unlike the patented technology, its products use targeted removal of material from specific regions of the tissue—and the correspondence between the sample well that material is placed in and the tissue location from which it originated—to generate spatial information.  The Court does not, of course, take infringement into account in determining claim construction.  *SRI Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1118 (Fed. Cir. 1985) ("It is only after the claims have been construed without reference to the accused device that the claims, as so construed, are applied to the accused device to determine infringement.").

## C.    The asserted patents

NanoString construes the asserted patents as disclosing only two embodiments for creating tissue maps—those described in Figures 1 and 2 of the patents. NanoString also contends that the concept of delivering encoded probes according to a spatial pattern underlies *both* embodiments.  Throughout the parties' joint claim construction brief, references are made to "the Group 1 patents," which are the six patents (the '669, '467, '113, '219, '878, and '917 patents) with similar claim language that supposedly corresponds to the approach in Figure 1.  Similarly, references are made to "the Group 2 patents," which are the two patents (the '566 and '607 patents) with similar claim language that supposedly corresponds to the approach in Figure 2. 10x, by contrast, contends that there are embodiments disclosed in the patents beyond those described in Figures 1 and 2 and that the claims in all patents cover both figures. Moreover, 10x disputes NanoString's description of Figure 2, contending that the Figure

3

2 approach involves indiscriminately (i.e., not in a spatial pattern) delivering probes that do not already have location coding tags attached.

### Discussion

"[T]he claims of a patent define the invention to which the patentee is entitled the right to exclude."  *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004).  During claim construction, a court is to construe the words of a claim in accordance with their "ordinary and customary meaning," namely "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention."  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–13 (Fed. Cir. 2005).  Sometimes, the meaning of a term is not immediately apparent, and a court will need to look to other sources to determine "what a person of skill in the art would have understood disputed claim language to mean."  *Innova*, 381 F.3d at 1116.  These sources include "the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art."  *Id.*  Expert testimony is one form of extrinsic evidence.[4]

Claims "must be read in view of the specification, of which they are a part."

---

[4] Throughout their joint claim construction brief, both parties cite the opinions and deposition testimony of Dr. Stacey Gabriel, 10x's expert.  But extrinsic evidence like this is "less significant than the intrinsic record in determining the legally operative meaning of claim language."  *Phillips*, 415 F.3d at 1317 (internal quotation marks omitted).  And as a general rule, it is only where the intrinsic evidence is ambiguous that a court may rely on extrinsic evidence to construe a claim term.  *See, e.g., Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 711 F.3d 1348, 1360 (Fed. Cir. 2013).  The Court finds that the intrinsic evidence here is sufficiently clear—particularly when considered in light of the parties' technology tutorials and oral arguments at the February 17, 2023 claim construction hearing—to construe the disputed claim terms without considering Dr. Gabriel's expert opinion.

*Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995).  But "'[a]lthough the specification may aid the court in interpreting the meaning of disputed claim language, particular embodiments and examples appearing in the specification will not generally be read into the claims.'"  *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998) (quoting *Constant v. Advanced Micro Devices, Inc.*, 848 F.2d 1560, 1571 (Fed. Cir. 1988)); *see also, Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 913 (Fed. Cir. 2004) ("[I]t is improper to read limitations from a preferred embodiment described in the specification—even if it is the only embodiment—into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited.").

Finally, there are two exceptions to the general rule that claim terms are given their ordinary meaning: "1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of a claim term either in the specification or during prosecution."  *Starhome GmbH v. AT&T Mobility LLC*, 743 F.3d 849, 856 (Fed. Cir. 2014).  "To disavow claim scope, the specification must contain expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope."  *See Cont'l Circuits LLC v. Intel Corp.*, 915 F.3d 788, 797 (Fed. Cir. 2019) (internal quotation marks omitted); *see also, Home Diagnostics, Inc. v. LifeScan, Inc.*, 381 F.3d 1352, 1358 (Fed. Cir. 2004) ("Absent a clear disavowal in the specification or the prosecution history, the patentee is entitled to the full scope of its claim language.").

    **1.**    **"delivering a plurality of probes to a tissue sample"**

        a.    *10x's proposed construction:*

            i.    plain and ordinary meaning

b.    *NanoString's proposed construction:*

i.    "immobilizing a plurality of probes on the tissue sample in a
spatial pattern"

c.    *The Court's construction:*

i.    plain and ordinary meaning

The parties' first dispute involves the term "delivering a plurality of probes to a
tissue sample" in claim 1 of the '878, '113, '669, '219, and '467 patents.  NanoString
contends that the term should be defined as "immobilizing a plurality of probes on the
tissue sample in a spatial pattern" because Dr. Mark Chee, the inventor of the asserted
patents, disavowed the broader claim scope advocated for by 10x.  10x disagrees,
contending that Dr. Chee's statements in the patent do not show a disavowal of claim
scope, and the patents describe multiple ways for delivering reagents with and without a
spatial pattern.  The Court agrees with 10x.

First, regarding NanoString's inclusion of the word "immobilizing," NanoString
has not offered a viable explanation for why delivering denotes or even implies
immobilizing.  Moreover, at the claim construction hearing held on February 17, 2022,
NanoString conceded that it would be amenable to a construction that omitted the word
"immobilizing."  The Court therefore declines to adopt a construction that includes this
term.  (The same applies to all of NanoString's proposed constructions that include the
term "immobilize" or "immobilizing.")

The remainder of NanoString's proposed construction is too narrow and
improperly attempts to read certain embodiments out of the patent.  *See Knowles Elecs.
LLC v. Iancu*, 886 F.3d 1369, 1375 (Fed. Cir. 2018) ("[The] proffered construction would

6

improperly read this embodiment out of the patent . . . .   A claim construction that does not encompass a disclosed embodiment is . . . rarely, if ever, correct.").  NanoString's basis for doing so is its contention that the majority of the asserted claims—those in what NanoString refers to as the Group 1 patents—should be construed to cover only the Figure 1 preferred embodiment.  The Court disagrees; the claim language applies to both preferred embodiments, as well as other methods and technologies for delivering probes with *and without* a pattern.

The preferred embodiments of Figures 1 and 2 describe different ways of delivering probes to a sample:  the Figure 1 approach involves delivering probes according to a spatial pattern, and the Figure 2 approach involves indiscriminate probe delivery.  In the Figure 2 approach, spatial patterning occurs not during delivery but rather in a subsequent step—when encoding oligonucleotides are attached to the probes according to location.  The same is true of other options described in the specification.  For example, the specification describes that the probes can be delivered to "segment[ed] or sequester[ed]" regions for "biological target determination."  Joint Claim Const. Br., Ex. A, '917 Patent at 16:41-45 (A287).  The use of specific areas and channels in the segmentation method allows reagents to be removed in a targeted fashion that preserves location information.

NanoString contends that because Dr. Chee repeatedly stated that the purpose of "the invention" was to deliver probes in a spatial pattern—and because he disparaged prior art that did not do so—he disavowed any claim scope that does not involve spatially patterned reagent delivery.  But a patentee's characterization of a disclosure as important to the invention, or as "the invention" itself, does not by itself

7

amount to disavowal.  *See Thorner v. Sony Comput. Ent. Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012) ("It is not enough for a patentee to simply disclose a single embodiment or use a word in the same manner in all embodiments, the patentee must clearly express an intent to redefine the term.") (internal quotation marks omitted); *see also*, *Absolute Software, Inc. v. Stealth Signal, Inc.*, 659 F.3d 1121, 1136 (Fed. Cir. 2011) ("[U]se of the phrase 'present invention' or 'this invention' is not always so limiting, . . . where other portions of the intrinsic evidence do not support applying the limitation to the entire patent.").

Instead, disavowal (at least in this context) requires a clear intent to disclaim features of the prior art that were disadvantageous through expressly disparaging statements.  *Rembrandt Patent Innovations, LLC v. Apple, Inc.*, 716 F. App'x 965, 972 (Fed. Cir. 2017).  Dr. Chee did not disparage the absence of spatial patterned reagent delivery but rather explained that the prior art failed to provide "random access to tissue samples," a deficiency to which the asserted patents are responsive.  Joint Claim Constr. Br., Ex. A, '917 Patent at 1:66-2:5 (A280).  Moreover, the statements highlighted by NanoString that supposedly support claim disavowal state that spatial patterning of *reagents* is integral to the invention, but that term (reagents) is not synonymous with the terms probes or encoded probes.  The claims and the shared specification thus indicate that spatial patterning must occur somewhere in the process and with some form of reagent—but they do not disclaim all formulations other than "immobilizing a plurality of probes on the tissue sample in a spatial pattern."  *See Kranos IP Corp. v. Riddell, Inc.*,

339 F. Supp. 3d 850, 853 (N.D. Ill. 2018)[5] (disavowal "may be undermined by other intrinsic evidence from the patent's specification.") (citing *Absolute Software, Inc. v. Stealth Signal, Inc.*, 659 F.3d 1121, 1136 (Fed. Cir. 2011)).

In addition to being supported by the language of the claims and specification, the Court's adopted construction is consistent with the prosecution history. *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722, 741(2002) (". . . the interpretation of the patent must begin with its literal claims, and the prosecution history is relevant to construing those claims.").  First, Prognosys obtained other patents that included the "spatial patterning" limitation that NanoString seeks to read into this claim, which suggests that it did not intend to include that limitation here.  Moreover, "[o]riginally, claims with both narrow language and broad language were applied for, with the applicant in each instance cancelling the narrow claims and pursuing only the broad claims."  Joint Claim Constr. Br. at 15.  10x thus overcame an anticipated rejection—based on prior art that teaches delivering probes (1) indiscriminately without a spatial pattern; and (2) without location-encoding agents—*without* including spatial pattern or location-encoding limitations.  This, too, is inconsistent with disavowal.

The resolution of this dispute that the Court adopts—applying the plain meaning

---

[5] As cited by NanoString, *Kranos* is distinguishable because there, this Court incorporated a limitation into the ultimate construction of the disputed term not only because it was mentioned repeatedly "throughout the specification" but because it was "in *every embodiment* described."  *Kranos IP Corp*, 339 F. Supp. 3d at 854 (emphasis added).  That is not the situation here.  The same is true of the supplemental authority provided to the Court by NanoString, *Ultravision Technologies, LLC, v. Govision, LLC et al.*, No. 2022-1098, 2023 WL 2182285, at *5 (Fed. Cir. 2023) (affirming the district court's construction of a disputed term based on its conclusion that "*every disclosed embodiment* includes a pair of LED panels operatively coupled to a daughter board.") (emphasis added) (internal quotation marks omitted).

of these terms and overruling NanoString's narrower construction—is in line with the patents' claim language and specification, as well as the prosecution history.  The patents are directed at multiple methods for delivering probes, and not all methods require the delivery of the probes to be done according to a spatial pattern in order to preserve location information.

> 2.  **"contacting a tissue sample with a plurality of probes"**
>
> > a.  *10x's proposed construction:*
> >
> > > i.  plain and ordinary meaning
> >
> > b.  *NanoString's proposed construction:*
> >
> > > i.  no construction; to the extent "generating" is not construed as NanoString proposes, "contacting" should be construed to mean: "immobilizing a plurality of probes on the tissue sample in a spatial pattern"
> >
> > c.  *The Court's construction:*
> >
> > > i.  plain and ordinary meaning

NanoString does not seek a construction for the term "contacting a tissue sample with a plurality of probes" in claim 1 of the '566 and '607 patents.  It proposes an alternative construction only if the Court does not adopt its construction for claim term 3, "generating."  NanoString's suggestion is needlessly complicated and would result in an inconsistent reading of the asserted patents.  *See SightSound Techs., LLC v. Apple Inc.*, 809 F.3d 1307, 1316 (Fed. Cir. 2015) ("Where multiple patents derive from the same parent application and share many common terms, we must interpret the claims consistently across all asserted patents.") (internal quotation marks omitted).  The Court

therefore construes claim terms 1 and 2—the "delivering" and "contacting" limitations—together and with the same result.

First, these terms describe the same step in the claimed workflow: the initial application of probes to a tissue sample.  The fact that NanoString seeks a narrower construction for "delivering" in what it deems the Group 1 patents than it does for the identical "contacting" step in what it deems the Group 2 patents further underscores the Court's conclusion in the preceding section that "delivering" is understandable on its own.  Moreover, NanoString conceded in its final invalidity contentions that the claim terms "delivering" and "contacting" have the same claim scope.  Joint Claim Constr. Br., Ex. C at 7 (A359) ("Conceptually a POSITA[6] would not differentiate between "delivering" and "contacting," as both require introducing a plurality of probes to a tissue sample.").  The Court sees no basis to construe these terms differently.

The Court therefore gives both "delivering a plurality of probes to a tissue sample" and "contacting a tissue sample with a plurality of probes" their plain and ordinary meaning, as 10x proposes.  No further construction is needed.

3.   **"generating"**

a.   *10x's proposed construction:*

i.   plain and ordinary meaning

b.   *NanoString's proposed construction:*

i.   "creating on the tissue according to a spatial pattern"

c.   *The Court's construction:*

i.   plain and ordinary meaning

---

[6] A person of ordinary skill in the art.

NanoString contends that the term "generating," which appears in the claims of the so-called Group 2 patents, should be construed as requiring "creating probes on the tissue according to a spatial pattern."  The term appears in the following phrase: "generating a nucleic acid molecule comprising all or a portion of the sequence of the oligonucleotide or a complement thereof and one or more nucleic acid tags that can be used to determine a location of the target protein [or mRNA] in the tissue sample."  Joint Claim Constr. Br., Ex. 2, '566 Patent at 32:63-67 (A567); Ex. 6, '607 Patent at 33:1-5 (A602).

NanoString's arguments regarding this claim term largely mirror its arguments regarding the two prior claim terms, namely, that "overwhelming evidence establishes that the inventor disavowed claim scope lacking the 'integral' feature of applying reagents to the tissue in a 'spatial pattern' . . . . [T]his essential feature must be included in the claims to correctly reflect the inventor's disavowal."  Joint Claim Constr. Br. at 41. 10x disagrees largely for the same reasons described above.  The same caselaw the Court has discussed applies.  The Court agrees with 10x that "generating" does not require reading in the limitations "creating," "on the tissue," and "according to a spatial pattern," and that the term should instead be given its plain and ordinary meaning.

First, the claim language does not disclose that "generating" must occur "on the tissue."  Independent claim 1 of the '566 and '607 patents is flexible about *where* exactly "generating" can occur; the patents teach only that, chronologically, "generating" occurs between the "contacting" and "sequencing" steps.  Moreover, dependent claim 28 of the '566 patent and claim 3 of the '607 patent both require removal of the oligonucleotide from the tissue sample prior to the generating step, which would make generating *on*

12

the tissue sample, as NanoString proposes, impossible.

Second, NanoString again stakes its proposed construction on the mistaken belief that the limitation—in this instance, the "generating" limitation—is exclusive to the Figure 2 embodiment, which corresponds only to the so-called Group 2 patents. The Court disagrees. Again, it is generally inappropriate to use a preferred embodiment outlined in the specification to limit the scope of a patent claim. *Acumed LLC v. Stryker Corp.*, 483 F.3d 800, 805 (Fed. Cir. 2007) (noting that it is improper to "import a feature from a preferred embodiment into the claims"). The Court agrees with 10x that "[g]enerating nucleic acids before sequencing is a common step that is potentially part of every embodiment and may even happen multiple different times within a single embodiment." Joint Claim Const. Br. at 42-43. The patents teach that "generating" may be accomplished by adding oligonucleotide "tags" to probes that have been transformed by cleavage, by PCR amplification (which occurs off the tissue), or with sequencing adapters.

The term "generating" must therefore retain its plain and ordinary meaning, as NanoString's proposed construction is too narrow and again inappropriately seeks to import limitations from the specification. *See Phillips*, 415 F.3d at 1323 (there is a "distinction between using the specification to interpret the meaning of a claim and importing limitations from the specification.").

    4. **"reagent delivery system"**

        a. *10x's proposed construction:*

            i. plain and ordinary meaning

        b. *NanoString's proposed construction:*

        i.      "a system that can be used to immobilize a plurality of probes on a tissue sample in a spatial pattern"

   c.    *The Court's construction:*

        i.      plain and ordinary meaning

NanoString asserts that the term "reagent delivery system" from claim 1 of the '917 patent should be construed to mean "a system that can be used to immobilize a plurality of probes on a tissue sample in a spatial pattern."  10x contends that the term should be given its plain and ordinary meaning because NanoString's addition of three proposed limitations—immobilize, probes, and spatial pattern—is inconsistent with the intrinsic evidence.  The Court agrees with 10x.

Many of the same points made regarding the "delivering" claim term are also relevant to this claim term, as it describes the hardware used to accomplish that step, and NanoString again insists that the patentee disavowed claim scope.  But claim 1 of the '917 patent describes a number of different methods and tools to deliver reagents to and collect them from discrete portions of a tissue sample in a way that preserves the integrity of the encoding scheme.  What is central to the patented system is its ability to ensure discrete delivery or retrieval.  Contrary to NanoString's contentions, this is not necessarily the same as spatial patterning.

As previously explained, maintaining the integrity of spatial patterns—through preserving location information in some form—can be accomplished a number of ways (e.g., through a "flow-cell" that can deliver reagents "across the substrate" or "only to certain portions of the array, restricting the amount and type of reagent delivered to any specific section of the array," Joint Claim Constr. Br., Ex. A, '917 Patent at 27:29-36

(A293)), not just through delivery of probes.  At the claim construction hearing, counsel

for 10x provided some examples of other instrumentation that the claim describes (the

Court quotes here from the rough version of the hearing transcript):

> It has pumps and valves and channels. It handles fluids. There is
> extensive disclosure in the patent of the different components that could
> makeup reagent delivery system. For example, you have pumps that are
> mechanisms for moving fluid, reagents in fluids, you can do positive or
> negative pressure, you can push things toward the sample, you can suck
> things off the sample using pumps. You have valves that permit the flow of
> these reagents in liquids through particular channels, all channels, no
> channels. The reagent delivery system is a broad system in the patent,
> there are many ways to implement systems to get fluids to and from the
> samples. So when we look at the claims of the '917 patent and think about
> how does this system maintain encoding schemes, it is not solely through
> delivery of probes."

Rough Tr. of Claim Constr. Hrg., Feb. 17, 2023 at 52.  The Court concludes there is no

appropriate basis to limit "reagent delivery system" to delivery of reagents "to" a tissue

sample or "in a spatial pattern."

NanoString's proposed inclusion of the word "probes" is similarly incorrect.  As

discussed above regarding the "delivering" and "contacting" claim terms, the patent

repeatedly uses the word "reagents," not probes, to describe what is being delivered by

the system.  The Court agrees with 10x that "one of ordinary skill would understand that

there are many different reagents involved in the assays described in the specification,

including buffers, enzymes, nucleic acids, solvents, and other agents."  Joint Claim

Constr. Br. at 47.  In other words, probes are one of a number of subcategories of

reagents, and the specification does not limit reagent delivery or retrieval to simply

delivery or retrieval of probes.

For these reasons, the Court overrules Nanostring's proposed contention.  The

term "reagent delivery system" does not require construction beyond its plain and

ordinary meaning.

    5.    **"sequence of the oligonucleotide"/ "sequence(s) of the**
        **oligonucleotide(s)" and**

    6.    **"oligonucleotide [having/comprising] a sequence"**

        a.    *10x's proposed constructions:*

            i.    Claim term 5: "order of nucleotides in the oligonucleotide"

            ii.    Claim term 6: "oligonucleotide having/comprising an order of nucleotides"

        b.    *NanoString's proposed constructions:*

            i.    Claim term 5: "order of nucleotides in the oligonucleotide that identifies a location in the tissue sample" / "order of nucleotides in the oligonucleotide(s) that identifies a location in the tissue sample"

            ii.    Claim term 6:

                '669, '219, '917, and '467 patents: "oligonucleotide having/comprising an order of nucleotides that identifies a location in the tissue sample"

                '566 and '607 patents, if "generating" is not construed as NanoString proposes, then: "oligonucleotide comprising an order of nucleotides that identifies a location in the tissue sample" / "oligonucleotide having/comprising an order of nucleotides"

        c.    *The Court's constructions:*

       i.        Claim term 5: "order of nucleotides in the oligonucleotide"

      ii.        Claim term 6: "oligonucleotide having/comprising an order of nucleotides"

The parties agree that the term "sequence of the oligonucleotide" in claim 1 of the '878, '113 '669, '219, '467, and '917 patents should, at a minimum, be construed to mean "order of nucleotides in the oligonucleotides." They also agree that the term "oligonucleotide [having/comprising] a sequence" in claim 1 of the '669, '219, '917, '467, '566, and '607 patents should, at a minimum, be construed to mean "oligonucleotide having/comprising an order of nucleotides." The parties dispute, however, whether the "sequence(s)" of "oligonucleotides" referred to in the claims should be further construed as requiring an order that identifies a location in the tissue sample for a certain subset of the patents. The Court agrees with 10x's proposed construction of "order of nucleotides in the oligonucleotide" and "oligonucleotide having/comprising an order of nucleotides."

For the so-called Group 1 patents, NanoString contends that location information is encoded in the sequence of the oligonucleotide and that sequencing of this information is what allows researchers to determine where the particular biological target that the capture agent reacted with is located. 10x disagrees, contending that the oligonucleotide acts not as a coding tag for location but rather as the probe that binds to the target molecule. NanoString contends that oligonucleotides acting as probes occurs only in the Figure 2 embodiment, in which the coding tags are delivered to the tissue sample in a spatial pattern and coupled to the probe (which was previously delivered to the tissue) upon delivery. NanoString states that, "In this scenario, the 'oligonucleotide' comprising a 'sequence' need not contain the location information, since the location

information is being delivered to the probe via one or more nucleic acid tags in the 'generating' step."  Joint Claim Constr. Br. at 52.  It therefore only seeks its proposed construction for the Group 2 patents if the Court does not adopt its construction of "generating."  As the Court has explained, however, NanoString's irregular and selective approach to claim construction is inappropriate.

NanoString is correct that the specification repeatedly references using an oligonucleotide as the coding tag in certain embodiments.  That does not mean, however, that this specific limitation should be read into all the claims.  When the patents describe how oligonucleotides are used for "coding," the word "coding" should be read in a more generic sense.  Although the patents teach that the sequence of oligonucleotides always codes for *something*, they do not teach that the sequence always codes for *location*.  For example, oligonucleotides can also be used as probes that interact with biological targets (i.e., identifying "the what" not "the where").  *See* Joint Claim Constr. Br., Ex. J, '669 Patent at 10:18-20 (A524) ("For purposes of this overview, *the probes are oligonucleotides*, but as explained elsewhere, *other types of probes can also be used*.") (emphasis added).  According to the specification, the oligonucleotide sequence is not the sole piece of information used to determine the presence of targets at certain locations on the tissue, and coding tags can be added both before collection or after collection.  This undercuts NanoString's contention that the patents require the sequence to encode position.  As described by counsel for plaintiffs at the claim construction hearing (again quoting from the rough transcript):

> So[metimes] you have oligonucleotides that identify the specific probes. Sometimes you also have oligonucleotides that identify where you put them. That's an optional feature. And in figure 2, you have this delivery of probes that are not encoded for location. When those probes have

oligonucleotides attached, they are not encoding oligonucleotides. They are just oligonucleotides that have different information. The use of the oligonucleotide to code for location is an optional feature in the patent and it's even optional between figures 1 and 2.

Rough Tr. of Claim Constr. Hrg., Feb. 17, 2023 at 59.

Unlike NanoString's construction, the Court's construction includes the full range of possible embodiments for both sets of patents, as "construing claims to exclude embodiments is disfavored" and "produces different constructions for the same term of the same patent family. . ."  Joint Claim Constr. Br. at 53 (citing *SightSound Techs.*, 809 F.3d at 1316 (claims must be construed consistently across all asserted patents stemming from the same parent application)).  The Court therefore declines to adopt NanoString's construction, which would limit the claims to the preferred embodiment in Figure 1 to the exclusion of other embodiments in which oligonucleotide sequences do not necessarily encode position.

7.   **"removing the oligonucleotide from [the/a] region of interest" / "removing the all [sic] or a portion of the oligonucleotide from a region of interest"**

a.   *10x's proposed construction:*

i.   plain and ordinary meaning

b.   *NanoString's proposed construction:*

i.   "eluting (*i.e.*, washing the tissue with a solvent) to remove the oligonucleotides from the tissue sample, including from the/a region of interest / eluting (*i.e.,* washing the tissue with a solvent) to remove all or a portion of the oligonucleotides from the tissue sample, including from a region of interest"

c.    *The Court's construction:*

i.    plain and ordinary meaning

The parties dispute whether the terms "removing the oligonucleotide from [the/a] region of interest" and "removing the all [sic] or a portion of the oligonucleotide from a region of interest"—found in claim 1 of the '878, '113, and '219 patents, claim 28 of '566 patent, and claim 3 of the '607 patent—should be construed to require *en masse* removal of oligonucleotides from the tissue sample by elution,[7] or if they encompass other removal methods, including targeted removal from discrete portions of the tissue. The Court agrees with 10x that, as with the "delivering" and "reagent delivery system" claim terms, the patents teach removal methods beyond the one proposed in NanoString's construction.  The claim terms should be read according to their plain and ordinary meaning.

NanoString's position is that removal of oligonucleotides must be construed as occurring *en masse* because the specification does not include any embodiments in which delivering and generating do not occur according to a spatial pattern.  Thus, NanoString contends, targeted removal would be redundant because the probes are already encoded with location information prior to being removed.  In other words, because NanoString considers spatial mapping to be the core of the invention, and because it contends that spatial mapping is achieved by preserving location information as probes are *introduced* to the tissue—not as they are *removed*—anything other than bulk, indiscriminate removal of oligonucleotides would be redundant.

---

[7] Elution is the process of removing one material from another by washing with a solvent.

20

10x contends, and the Court agrees, that the specification *does* describe alternative techniques and technologies for separating oligonucleotides from probes beyond elution.  That distinguishes this case from the cases[8] relied on by NanoString that involve importing a limitation (here, elution) from the specification *only* because no alternative disclosures were made in the patent.  One of the alternatives to *en masse* elution of oligonucleotides that the patent discloses is moving fluid into segmented or sequestered channels.  Another alternative is found in claim 5 of the '917 patent, which recites that the "reagent delivery system [is] to deliver *an elution composition sequentially to the first and second regions of interest to remove the first and second portions of the tissue sample*."  Joint Claim Constr. Br., Ex. A, '917 Patent at 34:14-17 (A296).  NanoString's proposal again runs afoul of the general principle against importing limitations from the specification to the exclusion of other embodiments.

The premise that the specification *requires* removal *en masse* is also belied by the fact that the claim language itself recites "removing the oligonucleotide *from a region of interest*," i.e., from less than the entire tissue sample.  NanoString contends that the phrase "from the region of interest" is coherent because "*en masse* removal of probes

---

[8] *See, e.g.*, *Kinetic Concepts, Inc. v. Blue Sky Med. Grp., Inc.*, 554 F.3d 1010, 1019 (Fed. Cir. 2009) (limiting "wound" to "skin wound," rather than allowing it to encompass "pus pockets," *where all of the examples in the specification involved skin wounds*) (emphasis added); *Profectus Tech. LLC v. Huawei Techs. Co.*, 823 F.3d 1375, 1381 (Fed. Cir. 2016) (construing "mountable" to require a "feature for mounting" because "*every embodiment*" "includes a feature for mounting the device to a wall or on a tabletop" and patentee "fails to pinpoint in the intrinsic record *where the patent contemplates a situation where no mounting features exist*") (emphasis added); *Sealant Sys. Int'l, Inc. v. TEK Glob., S.R.L.*, 616 F. App'x 987, 993 (Fed. Cir. 2015) ("There is simply *no guidance or indication whatsoever* of how the additional hose might 'cooperate with' a tire, *except as provided by the preferred embodiment*.") (emphasis added).

from the entire tissue sample will necessarily effectuate removal from the 'region of interest.'"  Joint Claim Const. Br. at 58.  This contention lacks merit.  *En masse* removal of oligonucleotides—which is by nature indiscriminate—and targeted removal of oligonucleotides from a "region of interest" are inconsistent.  Plaintiffs' proposed construction, which the Court adopts, is less strained and more logically consistent.

The patents contemplate more than just indiscriminate removal of oligonucleotides by washing with a solvent.  The Court therefore overrules NanoString's proposed construction.  The terms "removing the oligonucleotide from [the/a] region of interest" and "removing the all [sic] or a portion of the oligonucleotide from a region of interest" are to be given their plain and ordinary meaning.

### 8.    "a processing circuit arrangement"

NanoString contends that the phrase "a processing circuit arrangement" in claim 1 of the 917 patent renders it invalid for indefiniteness because it recites both a system and a method.  Because this is not really a matter of claim construction, and because issues of invalidity are more appropriately considered on a motion for summary judgment, the Court declines to address this argument.

### Conclusion

The disputed claim terms are construed in accordance with the conclusions set forth in this Memorandum Opinion and Order.  The parties are directed to file by March 14, 2023 a joint status report addressing any scheduling issues going forward and reporting on the history and current status of any settlement discussions.  The case is set for a telephonic status hearing on March 21, 2023 at 8:30 a.m. Central time (9:30 a.m. Eastern time), using call-in number 888-684-8852, access code 746-1053.  The

Court reserves the right to vacate the status hearing if it determines from the status report that a hearing is not needed.

_____
MATTHEW F. KENNELLY
United States District Judge

Date:  February 28, 2023