# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| 10X GENOMICS, INC. and PROGNOSYS BIOSCIENCES, INC.,<br><br>        Plaintiffs,<br><br>   v.<br><br>NANOSTRING TECHNOLOGIES, INC.,<br><br>        Defendant. | C.A. No. 21-cv-653-MFK |

## NANOSTRING TECHNOLOGIES, INC.'S BRIEF IN SUPPORT OF ITS MOTION FOR JUDGMENT AS A MATTER OF LAW ON NON-INFRINGEMENT AND DAMAGES AND OBJECTION TO THE COURT'S CLAIM CONSTRUCTION ORDER

OF COUNSEL:

Edward R. Reines (admitted *pro hac vice*)
Derek C. Walter (admitted *pro hac vice*)
Karnik F. Hajjar (admitted *pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, CA 94065
Tel: (650) 802-3000
Fax: (650) 802-3100
edward.reines@weil.com
derek.walter@weil.com
karnik.hajjar@weil.com

Christopher Pepe (admitted *pro hac vice*)
Amanda Branch (admitted *pro hac vice)*
WEIL, GOTSHAL & MANGES LLP
2001 M Street, NW, Suite 600
Washington, DC 20036
Phone: (202) 682-7000
Fax: (202) 857-0940
christopher.pepe@weil.com

Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
FARNAN LLP
919 North Market St., 12th Floor
Wilmington, DE 19801
Tel: (302) 777-0300
Fax: (302) 777-0301
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

*Attorneys for Defendant NanoString Technologies, Inc.*

Amanda.branch@weil.com

Yi Zhang (admitted *pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
Phone: (212) 310-8000
Fax: (212) 310-8007
yi.zhang@weil.com

Dated:  November 17, 2023

## TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ...................................................................................................1

II.   LEGAL STANDARD.............................................................................................1

III.  ARGUMENT ..........................................................................................................2

    A.   NanoString is Entitled to Judgment as a Matter of Law Regarding Non-Infringement of the Asserted Patents.................................................................2

        1.   NanoString and Its Customers Do Not Directly Infringe the Method Claims of the '219 Patent, '669 Patent, '566 Patent, '113 Patent, '878 Patent, and '607 Patent ...................................................2

            a)   Use of GeoMx Does Not Infringe Claim 21 of the '219 Patent.......................................................................................2

            b)   Use of GeoMx Does Not Infringe Claim 10 of the '669 Patent.......................................................................................3

            c)   Use of GeoMx Does Not Infringe Claim 17 of the '566 Patent.......................................................................................3

            d)   Use of GeoMx Does Not Infringe Claim 2 of the '113 Patent.......................................................................................4

            e)   Use of GeoMx Does Not Infringe Claim 25 of the '878 Patent.......................................................................................5

            f)   Use of GeoMx Does Not Infringe Claim 17 of the '607 Patent.......................................................................................5

        2.   GeoMx Does Not Directly Infringe Claim 5 Of The '917 Patent...............6

    B.   Plaintiffs Failed to Set Forth Sufficient Evidence to Support a Finding of Induced Infringement.........................................................................................8

    C.   Plaintiffs Failed to Set Forth Sufficient Evidence to Support a Finding of Contributory Infringement .................................................................................9

    D.   Plaintiffs Failed to Demonstrate that NanoString Willfully Infringes Any Of The Asserted Patents....................................................................................10

    E.   Plaintiffs Are Not Entitled To Compensatory Damages.......................................11

i

1.    Plaintiffs Failed to Demonstrate Entitlement to Lost Profits ..................... 11

2.    Plaintiffs Failed to Demonstrate Entitlement to its Proposed Reasonable Royalty ................................................................................. 13

F.    Plaintiffs Are Not Entitled To Compensatory Damages As To Foreign Sales Of GeoMx Based on Alleged Infringement of the '669, '566, '113, '219, '878, and '607 Patents ............................................................... 14

G.    Objection to the Court's Claim Construction Order .............................. 15

IV.    CONCLUSION ..................................................................................... 15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Apeldyn Corp. v. AU Optronics Corp.*,
  831 F. Supp. 2d 817 (D. Del. 2011).............................................................................10, 11

*ArcherDX, LLC v. QIAGEN Sciences, LLC*,
  No. 18-cv-1019 (MN), Memorandum Order, D.I. (D. Del. Aug. 30, 2021)...........................15

*Bayer Healthcare LLC v. Baxalta Inc.*,
  989 F.3d 964 (Fed. Cir. 2021)................................................................................................10

*Bio-Rad Labs., Inc. v. Int'l Trade Comm'n*,
  998 F.3d 1320 (Fed. Cir. 2021)......................................................................................8, 9, 10

*Carnegie Mellon University v. Marvell Tech. Grp., Ltd.*,
  807 F.2d 1283 (Fed. Cir. 2015)..............................................................................................14

*Glob.-Tech Appliances, Inc. v. SEB S.A.*,
  563 U.S. 754 (2011)..................................................................................................................8

*Lightning Lube, Inc. v. Witco Corp.*,
  4 F.3d 1153 (3d Cir. 1993).......................................................................................................1

*Limelight Networks, Inc. v. Akamai Techs., Inc.*,
  572 U.S. 915 (2014)..................................................................................................................9

*Linear Tech. Corp. v. Impala Linear Corp.*,
  379 F.3d 1311 (Fed. Cir. 2004)................................................................................................9

*Summit Tech., Inc. v. Nidek Co., Ltd.*,
  363 F.3d 1219 (Fed. Cir. 2004).................................................................................................1

*Zimmer Surgical, Inc. v. Stryker Corp.*,
  365 F. Supp. 3d 466 (D. Del. 2019)........................................................................................14

**Statutes**

35 U.S.C. § 271(c) ..............................................................................................................1, 10

**Other Authorities**

Fed. R. Civ. P. 50(a) ...................................................................................................................1

## I.      INTRODUCTION

Defendant NanoString Technologies, Inc. ("NanoString") respectfully submits this brief in support of its motion for judgment as a matter of law ("JMOL") on the following issues: (1) direct infringement of U.S. Patents 10,472,669 (the "'669 Patent"), 10,961,566 (the "'566 Patent"), 10,983,113 (the "'113 Patent"), 10,996,219 (the "'219 Patent"), 11,001,878 (the "'878 Patent"), 11,008,607 (the "'607 Patent"), 11,293,917 (the "'917 Patent") (collectively, the "Asserted Patents"); (2) indirect infringement of the Asserted Patents; (3) willful infringement of the Asserted Patents; (4) compensatory damages; and (5) compensatory damages as to foreign sales. In addition, NanoString respectfully objects to the Court's claim construction order.

NanoString hereby submits its motion and this opening brief in support of its motion highlighting the key reasons why JMOL is proper.  There are additional reasons and evidence set forth through the record that support this motion.

## II.     LEGAL STANDARD

Pursuant to Rule 50(a), a court may render judgment as a matter of law "[i]f a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a). "The grant or denial of a motion for judgment as a matter of law is a procedural issue not unique to patent law, reviewed under the law of the regional circuit in which the appeal from the district court would usually lie." *Summit Tech., Inc. v. Nidek Co., Ltd.*, 363 F.3d 1219, 1223 (Fed. Cir. 2004).  Judgment as a matter of law may be granted "only if, viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability." *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1166 (3d Cir. 1993).

1

III.   **ARGUMENT**

A.   **NanoString is Entitled to Judgment as a Matter of Law Regarding Non-Infringement of the Asserted Patents**

1.   **NanoString and Its Customers Do Not Directly Infringe the Method Claims of the '219 Patent, '669 Patent, '566 Patent, '113 Patent, '878 Patent, and '607 Patent**

Plaintiffs accuse NanoString's and NanoString customers' use of GeoMx of directly infringing claim 21 of the '219 Patent; claim 10 of the '669 Patent; claim 17 of the '566 Patent; claim 2 of the '113 Patent; claim 25 of the '878 Patent; and claim 17 of the '607 Patent. Plaintiffs failed to set forth sufficient evidence from which a jury reasonably could find in their favor with respect to direct infringement.

a)   **Use of GeoMx Does Not Infringe Claim 21 of the '219 Patent**

Claim 21 of the '219 Patent ultimately depends from Claim 1, which requires "using the determined sequence to determine the presence of the target biological molecule at the region of interest in the tissue sample." There is insufficient evidence from which a jury reasonably could find that use of GeoMx directly infringes claim 21 of the '219 Patent.

Plaintiffs have failed to demonstrate that use of GeoMx by NanoString and/or NanoString customers involves using "a determined sequence to determine the presence of the target biological molecule at the region of interest in the tissue sample." Plaintiffs asserted at trial that the claimed "determined sequence" corresponds to the i5 and i7 indices in GeoMx assays that use an NGS readout. Tr. at 314:15-315:2. In particular, Plaintiffs' expert Dr. Quackenbush testified that the i5 and i7 indices used in GeoMx "actually encode the spatial information." Tr. 314:22-315:2. NanoString engineer Margaret Hoang testified, however, that the i5 and i7 indices in GeoMx are used to track the sample ID and demultiplex the sequencing run on the Illumina platform. Tr. at

2

290:9.  Dr. Beechem likewise testified that the sequences in GeoMx do not include any information concerning the location of the region of interest, and instead only include information concerning the target analyte.  Tr. at 651:19-24.

As explained by Dr. Beechem and Dr. Edwards, GeoMx determines "the presence of the target biological molecule at the region of interest in the tissue sample" by capturing an image of the tissue sample to track the location of the target biological molecule in the region of interest. Tr. at 651:25-652:14; 777:7-781:9.  GeoMx therefore does not use a "determined sequence to determine the presence of the target biological molecule at the region of interest in the tissue sample."  Tr. at 777:7-781:9.  Plaintiffs have failed to set forth sufficient evidence to demonstrate otherwise.

### b)      Use of GeoMx Does Not Infringe Claim 10 of the '669 Patent

Claim 10 of the '669 Patent ultimately depends from Claim 1, which requires "using the determined sequence(s) to associate presence or abundance of the target biological molecule(s) with the location of interest of the tissue sample."  Plaintiffs contend that the i5 and i7 indices used in GeoMx assays for NGS readout correspond to the "determined sequence" that is purportedly used "to associate presence or abundance of the target biological molecule(s) with the location of interest of the tissue sample."  Tr. at 314:15-315:2.  As explained above in Section III.A.1.a, however, the i5 and i7 sequences are used to track the sample ID and demultiplex the sequencing run on the Illumina platform.  As such, Plaintiffs failed to set forth sufficient evidence from which a jury reasonably could find that use of GeoMx directly infringes Claim 10 of the '669 Patent.

### c)      Use of GeoMx Does Not Infringe Claim 17 of the '566 Patent

Claim 17 of the '566 Patent ultimately depends from Claim 1, which requires "determining all or a portion of a sequence of the nucleic acid molecule or a complement thereof to detect the

3

target protein and determine its associated location in the tissue sample." Plaintiffs contend that the i5 and i7 indices used in GeoMx assays for NGS readout correspond to the "portion of a sequence" that is purportedly used to "detect the target protein and determine its associated location in the tissue sample." Tr. at 314:15-315:2. As explained above in Section III.A.1.a, however, the i5 and i7 sequences are used to track the sample ID and demultiplex the sequencing run on the Illumina platform. As such, Plaintiffs failed to set forth sufficient evidence from which a jury reasonably could find that use of GeoMx directly infringes Claim 17 of the '566 Patent.

**d)      Use of GeoMx Does Not Infringe Claim 2 of the '113 Patent**

Claim 2 of the '113 Patent ultimately depends from claim 1, which requires "using the sequence to determine the presence or abundance of the target protein at the region of interest in the tissue sample." Plaintiffs contend that the i5 and i7 indices used in GeoMx assays for NGS readout correspond to the "sequence" that is purportedly used to "determine the presence or abundance of the target protein at the region of interest in the tissue sample." Tr. at 314:15-315:2. Plaintiffs similarly contend that the "HYB code letter" in GeoMx assays for nCounter readout correspond to the claimed "sequence" that is purportedly used to "determine the presence or abundance of the target protein at the region of interest in the tissue sample." Tr. at 334:2-7.

As explained above in Section III.A.1.a, however, the i5 and i7 sequences are used to track the sample ID and demultiplex the sequencing run on the Illumina platform. As such, Plaintiffs have failed to set forth sufficient evidence that GeoMx assays for use with NGS readout comprise a sequence that is used "to determine the presence or abundance of the target protein at the region of interest in the tissue sample."

Plaintiffs have similarly failed to set forth any evidence that the "HYB code letter" is used to "determine the presence or abundance of the target protein at the region of interest in the tissue

4

sample."  As conceded by Dr. Quackenbush, the HYB code letter in the GeoMx assays for use with nCounter is used to identify a well in the microtiter plate.  Tr. 334:2-335:11.  As such, the "HYB code letter" is not a sequence that is determined "to determine the presence or abundance of the target protein at the region of interest in the tissue sample."  *See also* Tr. at 780:3-781:3.

Plaintiffs have therefore failed to set forth sufficient evidence from which a jury reasonably could find that GeoMx assays for use with either NGS or nCounter readouts directly infringe Claim 2 of the '113 Patent.

### e)     Use of GeoMx Does Not Infringe Claim 25 of the '878 Patent

Claim 25 of the '878 Patent ultimately depends from claim 1, which requires "using the determined sequence of the oligonucleotide to determine presence or abundance or both of the target biological molecule at the region of interest in the tissue sample."  Plaintiffs asserted that the "HYB code letter" in GeoMx assays for nCounter readout correspond to the "determined sequence."  *See* Section III.A.1.d *supra*.  As explained above, the "HYB code letter" used in GeoMx assays for nCounter readout is used to identify a well in the microtiter plate.  *See id*.  As such, there is insufficient evidence from which a reasonable jury could conclude that use of GeoMx directly infringes Claim 25 of the '878 Patent.

### f)     Use of GeoMx Does Not Infringe Claim 17 of the '607 Patent

Claim 17 of the '607 Patent ultimately depends from Claim 1, which requires "determining all or a portion of a sequence of the nucleic acid molecule or a complement thereof to detect the target mRNA and determine its location in the tissue sample."  Plaintiffs contend that the i5 and i7 indices used in GeoMx assays for NGS readout correspond to the "portion of a sequence of the nucleic acid" that is purportedly used to "detect the target mRNA and determine its location in the tissue sample."  Tr. at 314:15-315:2.  As explained above in Section III.A.1.a, however, the i5 and

5

i7 sequences are used to track the sample ID and demultiplex the sequencing run on the Illumina platform. As such, there is insufficient evidence from which a reasonable jury could conclude that use of GeoMx directly infringes Claim 17 of the '607 Patent.

### 2. GeoMx Does Not Directly Infringe Claim 5 Of The '917 Patent

Plaintiffs accuse NanoString's GeoMx instrument of infringing Claim 5 of the '917 Patent, which ultimately depends from claim 1.  Plaintiffs have failed to set forth sufficient evidence from which a reasonable jury could conclude that GeoMx meets at least three limitations of Claim 5 of the '917 Patent.

First, Claim 5 (via Claim 1) requires removing "a portion of the tissue sample from the region of interest."  Plaintiffs contend that GeoMx meets this limitation because it removes oligonucleotides from the region of interest.  Tr. at 309:12-310:9.  Plaintiffs' contention, however, is based on the incorrect assertion that an oligonucleotide is "a portion of the tissue sample."  Tr. at 393:10-394:8.  As explained by Dr. Beechem, GeoMx DSP does not remove any portion of the tissue from the region of interest, and instead only removes oligonucleotides during the aspiration step.  Tr. at 652:15-24; *see also* Tr. at 781:16-783:17.  Accordingly, there is no evidence that could support a reasonable conclusion that GeoMx meets this limitation.  Tr. at 781:16-783:17.

Second, Claim 5 (via Claim 1) requires delivering "the removed portion of the tissue sample through the at least one reagent channel."  Although Plaintiffs asserted that this limitation is met by the aspiration step of the GeoMx workflow, there is no evidence that the oligonucleotides are removed *through* a channel during this step.  Plaintiffs' expert Dr. Quackenbush mistakenly asserted that GeoMx meets this limitation because the oligonucleotides are allegedly "collected through the microcapillary tube."  Tr. at 310:10-16.  To the contrary, Dr. Beechem and Mr. Gray both testified that GeoMx aspirates oligonucleotides into the tip of a microcapillary.  Tr. at 516:2-

6

6; 651:8-18.  Accordingly, there is no record evidence that could reasonably support a conclusion that GeoMx includes a "reagent channel," or that GeoMx removes oligonucleotides through any such channel.  *See also* Tr. 783:18-786:4.

Plaintiffs likewise failed to set forth evidence that GeoMx meets the "removed portion of the tissue sample through the at least one reagent channel" under the doctrine of equivalents.  For example, Dr. Quackenbush testified that the microcapillary in GeoMx allegedly performs the same function as the claimed "reagent channel" because it moves "liquid from here to there" to "prevent cross-contamination."   Tr. at 350:15-19.   Dr. Quackenbush's testimony regarding "cross-contamination" bares no relationship to the language of the claim, which requires delivering "the removed portion of the tissue sample through the at least one reagent channel."  Dr. Quackenbush's testimony is therefore insufficient as a matter of law to demonstrate direct infringement under the doctrine of equivalents.  *See also* Tr. 783:18-786:4.

Third, Claim 5 requires delivering "an elution composition sequentially to the first and second regions of interest to remove the first and second portions of the tissue sample."  Even if removing oligonucleotides constitutes removing "a portion of the tissue sample," GeoMx does not deliver "an elution composition…to remove" portions of the tissue sample.  Dr. Quackenbush, for example, admitted that the purported elution composition in GeoMx is applied to wash the region of interest.  Tr. at 356:23-357:6.  As explained by Dr. Beechem and Mr. Gray and effectively admitted by Dr. Quackenbush, GeoMx removes oligonucleotides from the tissue sample not by delivering an elution composition but by shining UV light, which are subsequently aspirated into the tip of a microcapillary.  Tr. at 392:7-394:8, 516:2-18; 650:22-651:18.

7

Plaintiffs likewise failed to set forth sufficient evidence that GeoMx delivers "an elution composition sequentially to the first and second regions of interest to remove the first and second portions of the tissue sample" under the doctrine of equivalents.  For example, Dr. Quackenbush testified that the buffer solution functions to wash the region of interest (Tr. at 356:23-357:6), which is not the same as the removal function required by claim 5.  Plaintiffs therefore failed to set forth evidence to demonstrate that GeoMx delivers "an elution composition sequentially to the first and second regions of interest to remove the first and second portions of the tissue sample" under the doctrine of equivalents.

## B.    Plaintiffs Failed to Set Forth Sufficient Evidence to Support a Finding of Induced Infringement

Plaintiffs have failed to set forth sufficient evidence to carry their burden to prove inducing infringement.  A party is liable for active inducement only if the patent owner proves by a preponderance of the evidence that there was "underlying direct infringement, as well as proof that (1) 'the defendant knew of the patent,' (2) the defendant knew or should have known that 'the induced acts constitute patent infringement,' and (3) the defendant 'possessed specific intent to encourage another's infringement.'" *Bio-Rad Labs., Inc. v. Int'l Trade Comm'n*, 998 F.3d 1320, 1335 (Fed. Cir. 2021).  Plaintiffs have failed to prove these elements of induced infringement including but not limited to culpable intent.  *See Glob.-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 766 (2011) ("induced infringement under § 271(b) requires knowledge that the induced acts constitute patent infringement").

First, Plaintiffs have failed to demonstrate an act of underlying direct infringement by NanoString or NanoString's customers, as explained in Section III.A above, which is required to demonstrate induced infringement.  *See e.g.*, *Limelight Networks, Inc. v. Akamai Techs., Inc.*, 572

U.S. 915, 922 (2014) ("where there has been no direct infringement, there can be no inducement of infringement under § 271(b).").

Second, Plaintiffs failed to set forth any evidence that NanoString knew that its induced acts constituted patent infringement or that NanoString engaged in culpable conduct.  Tr. at 385:17-386:3.  At most, Plaintiffs set forth evidence that NanoString knows that customers perform the GeoMx workflow and encourages them to do so (Tr. at 360:9-25; 361:17-364:11), but this is insufficient to demonstrate that NanoString "knew or should have known that the induced acts constitute patent infringement" and "possessed specific intent to encourage another's infringement." *Bio-Rad Labs.*, 998 F.3d at 1335.

## C. Plaintiffs Failed to Set Forth Sufficient Evidence to Support a Finding of Contributory Infringement

Plaintiffs failed to carry their burden to prove contributory infringement, which requires "an underlying act of direct infringement." *Linear Tech. Corp. v. Impala Linear Corp.*, 379 F.3d 1311, 1326 (Fed. Cir. 2004) (citing *Joy Techs., Inc. v. Flakt, Inc.*, 6 F.3d 770, 774 (Fed.Cir.1993)). Further, "[c]ontributory infringement under 35 U.S.C. § 271(c) requires proof that (1) the defendant had 'knowledge of the patent in suit,' (2) the defendant had 'knowledge of patent infringement,' and (3) the accused product is not a staple article or commodity of commerce suitable for a substantial noninfringing use." *Bio-Rad Labs.*, 998 F.3d at 1335 (quoting *Commil USA, LLC v. Cisco Sys., Inc.*, 575 U.S. 632, 639 (2015)). For at least the reasons described above, Plaintiffs have not proven the elements of contributory infringement including but not limited to an underlying act of direct infringement and "knowledge of patent infringement." *Id.*

In addition, Plaintiffs failed to demonstrate that GeoMx lacks substantial non-infringing uses.  Plaintiffs' evidence on this issue consists solely of a single conclusory statement by its expert

Dr. Quackenbush that GeoMx did not have "any kind of reasonable use" beyond those discussed in his testimony.  Tr. at 365:1-3.  This is insufficient as a matter of law for Plaintiffs to meet their burden of demonstrating that GeoMx is not capable of substantial non-infringing uses.

### D. Plaintiffs Failed to Demonstrate that NanoString Willfully Infringes Any Of The Asserted Patents

Plaintiffs also failed to carry their burden of proving willful infringement.  "Knowledge of the asserted patent and evidence of infringement is necessary, but not sufficient, for a finding of willfulness.  Rather, willfulness requires deliberate or intentional infringement."  *Bayer Healthcare LLC v. Baxalta Inc.*, 989 F.3d 964, 988 (Fed. Cir. 2021).  Willful blindness may only substitute for willfulness when a defendant "takes deliberate actions to avoid confirming a high probability of wrongdoing and who can almost be said to have actually known the critical facts."  *Apeldyn Corp. v. AU Optronics Corp.*, 831 F. Supp. 2d 817, 831 (D. Del. 2011) (citing *Global-Tech Appliances, Inc. v. Seb S. A.*, 564 U.S. 754, 768 (2011)).

Here, Plaintiffs failed to set forth any evidence that NanoString's alleged infringement of the Asserted Claims was intentional.  In particular, none of NanoString's witnesses testified that NanoString knew it was infringing the Asserted Patents, and Plaintiffs failed to set forth any evidence demonstrating otherwise.

Plaintiffs also failed to set forth any evidence that NanoString took "deliberate actions to avoid confirming a high probability of wrongdoing."  The record evidence demonstrates that NanoString conducted a freedom to operate analysis prior to launching GeoMx (Tr. at 600:6-13), the Asserted Patents did not issue until after NanoString launched GeoMx (Tr. at 262:20-263:17), NanoString did not have knowledge of the Asserted Patents until one day before the filing of the Complaint (Tr. at 571:18-572:23), and NanoString reasonably believed that it did not infringe the

10

Asserted Patents once it learned of them.  Tr. at 777:4-786:4.  There is otherwise no evidence that NanoString took "deliberate actions to avoid confirming a high probability of wrongdoing." *Apeldyn Corp.*, 831 F. Supp. 2d at 831 (citing *Global-Tech Appliances, Inc. v. SEB S. A.*, 564 U.S. 754, 768 (2011)).  As such, NanoString is entitled to judgment as a matter of law that it does not willfully infringe any of the Asserted Patents.

### E.      Plaintiffs Are Not Entitled To Compensatory Damages

Plaintiffs have failed to prove they are entitled to compensatory damages.  For all the reasons described above, Plaintiffs failed to meet their burden to prove that NanoString directly, indirectly, or willfully infringed the Asserted Patents.  Plaintiffs seek $34. 1 million in lost profits (Tr. 426:15-17) and $7.3 million in royalties (Tr. 444:3-6) for alleged infringement of the asserted claims, or alternatively $13.6 million (Tr. at 444:20) in reasonable royalty if lost profits are not available.

### 1.      Plaintiffs Failed to Demonstrate Entitlement to Lost Profits

As to lost profits, Plaintiffs seek almost all consumables sales by NanoString from May 6, 2021 except for customers that "bought protein only."  (Tr. 475:2-4).  Plaintiffs have failed to satisfy the burden by a preponderance of the evidence that it is entitled to these sales.

As per the *Panduit* test, a plaintiff seeking lost profits must satisfy all four *Panduit* factors. Here, Plaintiffs have failed to prove the absence of non-infringing alternatives.  Dr. Quackenbush's mere assertion that there are no meaningful competitors to 10x's Visium besides the GeoMx is not sufficient to meet Plaintiff's burden.  Ms. Davis did not deny the testimony of Dr. Rao that 10x trained its sales force on a variety of competitors to Visium. (Tr. at 478:11-15).  She admitted she did not perform any customer surveys or analysis.  (Tr. 475:24-476:7, 476:15-25).  Similarly, there was ample testimony that GeoMx has many features that just are not available from Visium. (Tr.

567:1-569:6).[1] Plaintiffs have not set forth sufficient evidence to show with sufficient certainty that 10x would capture all sales of consumables but-for NanoString GeoMx's presence in the market, because other options were available and Visium was not a sufficient substitute for all of GeoMx's capabilities.

Nor has 10x established the requisite capacity. Since Ms. Davis failed to demonstrate how many additional units of Visium 10x would sell, 10x failed to prove it had the marketing and manufacturing capacity actually required to capture the additional sales. Ms. Davis merely based her conclusion on consumables revenue – not units. Therefore, there is no way to determine whether 10x could satisfy increased capacity. Ms. Davis asserted that "10x had always been able to meet whatever demand is faced" for "these kinds of products" but doesn't know what those specific products are. (421:18-21). That 10x has never had a problem before does not demonstrate that it could increase again, particularly whereas here, Ms. Davis acknowledges 10x would have to increase its sales of consumables by 50%. (488:24-489:3). The same is true for marketing capacity. Ms. Davis referenced a purported large sales force, but in addressing increased marketing capacity, did not provide any evidence that 10X's current sales force could double the sales volume. Tr. at 488:24-489:3).

For the same reasons, there is a failure of proof of quantification. Ms. Davis contends that 10x would not have to spend a single additional dollar beyond COGS or a 3% sales commission – no increased personnel, product support, etc. – to cover a 50% increase in sales. Likewise, because

---

[1] 10x attempted to belatedly interject the Visium CytAssist into the case as an alternative. Importantly, CytAssist was not disclosed or relied upon by Ms. Davis in her expert report. Ms. Davis admitted it was not part of her expert analysis – she only heard it at trial. (Tr. 477:9-15). In any event, there is no evidence in the record as to whether CytAssist was available for sale during the damages period or that it performs any functions equivalent to GeoMx.

Ms. Davis has not quantified units, her revenue assumption is flawed.  Ms. Davis admitted she did not correlate the products GeoMx sold to the products 10x would allegedly sell. (Tr. 475:15-23).  Ms. Davis' lost profits quantification is also fundamentally flawed because it includes revenue for GeoMx consumables for protein, which is a feature that Visium did not have during the relevant periods.  (Tr. 474:23-475:13).

Based on the Panduit factors, Plaintiffs are not entitled to lost profits damages.

> **2.    Plaintiffs Failed to Demonstrate Entitlement to its Proposed Reasonable Royalty**

Plaintiffs are not entitled to reasonable royalty damages (either for the remainder of non-addressable lost profits revenue or as an alternative minimum calculation).  Plaintiffs have no support for their 15% royalty rate.

Ms. Davis' analytical approach was fundamentally flawed and legally insufficient, and her calculations were soundly disproven.  The premise of Ms. Davis's analysis was her unsupported conclusion that NanoString's margins on GeoMx were nearly 80%.  (Tr. at 436:24-437:2.)  Mr. Gray established (Tr. 508:12-509:6), as confirmed by NanoString's 10k filings (Tr. 479:10-25), that the company's gross margin is approximately 50% percent.  Ms. Davis did not deny this.  *Id.* Likewise, Ms. Davis made the illogical assumption that NanoString's has a 100% gross margin for services revenue – an entirely implausible calculation for a line item that includes human capital. Despite this, she contended that the analytical approach supported an 18% royalty rate, as the delta between what NanoString would make if it could only sell nCounter versus being able to sell GeoMx. Because the 18% delta and corresponding royalty is unsupportable, this argument fails.

13

Plaintiffs only other support for their 15% royalty rate is the 10x/ReadCoor acquisition agreement.  However, this was not a license agreement, but the acquisition of an entire company and is therefore not economically comparable. (Tr. 432:18-22).   It also is not technically comparable.  The acquisition did not relate to the patents in suit, which are separately covered by the Prognosys agreement. The only attempt to prove technical comparability is the high level, vague assertion that the patents are "foundational" like the Prognosys patents. (Tr. 374:16-23). *Zimmer Surgical, Inc. v. Stryker Corp.*, 365 F. Supp. 3d 466, 495 (D. Del. 2019) (finding that the use of "broad and nebulous language to describe the technological comparability" of patents failed to establish technological comparability).

**F.      Plaintiffs Are Not Entitled To Compensatory Damages As To Foreign Sales Of GeoMx Based on Alleged Infringement of the '669, '566, '113, '219, '878, and '607 Patents**

Plaintiffs seek royalties for sales of GeoMx consumables to customers outside of the United States.  However, the asserted claims of the '669, '566, '113, '219, '878, and '607 Patents are method claims.  Plaintiffs have failed to present sufficient evidence to support liability for damages for sales to customers outside the United states under *Carnegie Mellon University v. Marvell Tech. Grp., Ltd.*, 807 F.2d 1283 (Fed. Cir. 2015). To the extent the 917 Patent is not infringed, there should be no foreign sales awarded in either lost profits or reasonable royalty.

Under *Carnegie Mellon*, damages may be awarded on sales of products that practice the patented methods in their normal intended use outside of the United States only if (1) the alleged infringement inside the United States was a substantial cause of the sale of that product and (2) the alleged infringer made or sold the product within the United States.  *ArcherDX, LLC v. QIAGEN Sciences, LLC*, No. 18-cv-1019 (MN), Memorandum Order, D.I. 466 at 3 (D. Del. Aug. 30, 2021) (discussing *Carnegie Mellon*).  Here, Plaintiffs failed to submit any evidence that NanoString's

14

alleged infringement of the '669, '566, '113, '219, '878, and '607 Patents inside the United States was a substantial cause of its sales of GeoMx outside the United States.  As such, Plaintiffs are not entitled to damages for sales of GeoMx outside the United States based on the '669, '566, '113, '219, '878, and '607 Patents.

> **G.** **Objection to the Court's Claim Construction Order**

In addition, for the reasons stated during the claim construction proceedings, including in NanoString's briefing and at the claim construction hearing, NanoString hereby objects to the Court's claim constructions and preserves those objections to those constructions.

## IV.    CONCLUSION

For the reasons set forth above and on the basis of the trial record, and as set forth at trial, NanoString respectfully requests that the Court enter judgment as a matter of law on the issues set forth herein.

Dated: November 17, 2023

OF COUNSEL

Edward R. Reines (admitted *pro hac vice*)
Derek C. Walter (admitted *pro hac vice*)
Karnik F. Hajjar (admitted *pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, CA 94065
Tel: (650) 802-3000
Fax: (650) 802-3100
edward.reines@weil.com
derek.walter@weil.com
karnik.hajjar@weil.com

Christopher Pepe (admitted *pro hac vice*)
Amanda Branch (admitted *pro hac vice)*
WEIL, GOTSHAL & MANGES LLP
2001 M Street, NW, Suite 600
Washington, DC 20036
Phone: (202) 682-7000
Fax: (202) 857-0940
christopher.pepe@weil.com
amanda.branch@weil.com

Yi Zhang (admitted *pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
Phone: (212) 310-8000
Fax: (212) 310-8007
yi.zhang@weil.com

Respectfully submitted,

FARNAN LLP

*/s/ Brian E. Farnan*
Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
919 North Market St., 12th Floor
Wilmington, DE 19801
Tel: (302) 777-0300
Fax: (302) 777-0301
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

16