# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| 10X GENOMICS, INC. and PROGNOSYS BIOSCIENCES, INC., <br><br> Plaintiffs, <br><br> v. <br><br> NANOSTRING TECHNOLOGIES, INC., <br><br> Defendant. | C.A. No. 21-cv-653-MFK |

## NANOSTRING TECHNOLOGIES, INC.'S BRIEF IN SUPPORT OF ITS MOTION FOR JUDGMENT AS A MATTER OF LAW UNDER FRCP 50 AND FOR A NEW TRIAL UNDER FRCP 59

Dated: December 20, 2023

Edward R. Reines (admitted *pro hac vice*)
Derek C. Walter (admitted *pro hac vice*)
Karnik F. Hajjar (admitted *pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, CA 94065
Tel: (650) 802-3000
Fax: (650) 802-3100
edward.reines@weil.com
derek.walter@weil.com
karnik.hajjar@weil.com

Christopher Pepe (admitted *pro hac vice*)
Amanda K. Branch (admitted *pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
2001 M Street, NW, Suite 600
Washington, DC 20036
Phone: (202) 682-7000
Fax: (202) 857-0940
christopher.pepe@weil.com
amanda.branch@weil.com

Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
FARNAN LLP
919 North Market St., 12th Floor
Wilmington, DE 19801
Tel: (302) 777-0300
Fax: (302) 777-0301
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

*Attorneys for Defendant NanoString Technologies, Inc.*

Yi Zhang (admitted *pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
Phone: (212) 310-8000
Fax: (212) 310-8007
yi.zhang@weil.com

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ........................................................................................................1

II.     BACKGROUND .........................................................................................................1

III.    LEGAL STANDARD...................................................................................................2

IV.     ARGUMENT ...............................................................................................................2

     A.     The Court Should Grant JMOL of Invalidity for Lack of Written
         Description or, Alternatively, Order a New Trial. ....................................................2

     B.     The Court Should Grant JMOL of Non-Infringement or, Alternatively,
         Order a New Trial. ...............................................................................................12

          1.     The Court Should Construe the Claims as Limited to Spatial
              Delivery..................................................................................................12

          2.     Plaintiffs Failed To Prove Infringement Under the Pre-Trial
              Constructions. ........................................................................................15

          3.     Plaintiffs Failed to Prove Induced, Contributory, or Willful
              Infringement...........................................................................................17

     C.     The Court Should Grant JMOL of No Damages or, Alternatively, Order a
         New Trial. ............................................................................................................18

          1.     There Was Insufficient Evidence of Plaintiffs' Lost Profits
              Damages..................................................................................................18

           2.     There Was Insufficient Evidence of Plaintiffs' Reasonable Royalty
               Damages..................................................................................................22

V.      CONCLUSION...........................................................................................................25

i

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Apeldyn Corp. v. AU Optronics Corp.*,
831 F.Supp.2d 817 (D. Del. 2011) ............................................................ 18

*Bayer Healthcare LLC v. Baxalta Inc.*,
989 F.3d 964 (Fed. Cir. 2021) ................................................................ 18

*Bio-Rad Labs., Inc. v. Int'l Trade Comm'n*,
998 F.3d 1320 (Fed. Cir. 2021) .............................................................. 17

*Campbell Soup Co. v. Gamon Plus, Inc.*,
No. 2020-2322, 2021 WL 3671366 (Fed. Cir. Aug. 19, 2021) ............... 13

*ePlus, Inc. v. Lawson Software, Inc.*,
700 F.3d 509 (Fed. Cir. 2012) ................................................................ 24

*Gardner-Lozada v. SEPTA*,
643 Fed. Appx. 196 (3d Cir. 2016) ........................................................... 2

*Gentry Gallery, Inc. v. Berkline Corp.*,
134 F.3d 1473 (Fed. Cir. 1998) .............................................................. 10

*Global-Tech Appliances, Inc. v. SEB S. A.*,
563 U.S. 754 (2011) ................................................................................ 18

*ICU Med., Inc. v. Alaris Med. Sys., Inc.*,
558 F.3d 1368 (Fed. Cir. 2009) .............................................................. 10

*Juno Therapeutics, Inc. v. Kite Pharma, Inc.*,
10 F.4th 1330 (Fed. Cir. 2021) ........................................................ 2, 3, 7

*Leonard v. Semtech Int'l Inc.*,
834 F.3d 376 (3d Cir. 2016) ..................................................................... 2

*Limelight Networks, Inc. v. Akamai Techs., Inc.*,
572 U.S. 915 (2014) ................................................................................ 17

*Linear Tech. Corp. v. Impala Linear Corp.*,
379 F.3d 1311 (Fed. Cir. 2004) .............................................................. 17

*Lockwood v. Am. Airlines, Inc.*,
107 F.3d 1565 (Fed. Cir. 1997) ................................................................ 8

*Omega Patents, LLC v. CalAmp Corp.*,
   13 F.4th 1361 (Fed. Cir. 2021) ........................................................................... 18

*Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*,
   575 F.2d 1152 (6th Cir. 1978) ...................................................................... 19, 21

*Phillips v. AWH Corp.*,
   415 F.3d 1303 (Fed. Cir. 2005) ........................................................................... 12

*Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*,
   875 F.3d 1369 (Fed. Cir. 2017) ............................................................... 19, 20, 21

*ResQNet.com, Inc. v. Lansa, Inc.*,
   594 F.3d 860 (Fed. Cir. 2010) ...................................................................... 23, 25

*Rivera v. Int'l Trade Comm'n*,
   857 F.3d 1315 (Fed. Cir. 2017) ........................................................................... 10

*Russell v. Dodge*,
   93 U.S. 460 (1876) ............................................................................................... 10

*Techtronic Indus. Co. Ltd. v. Int'l Trade Comm'n*,
   944 F.3d 901 (Fed. Cir. 2019) ............................................................................ 12

*Teva Pharms. USA, Inc. v. Sandoz, Inc.*,
   574 U.S. 318 (2015) ............................................................................................. 14

*Tronzo v. Biomet, Inc.*,
   156 F.3d 1154 (Fed. Cir. 1998) ........................................................................... 10

*VLSI Tech. LLC v. Intel Corp.*,
   No. 2022-1906, 2023 WL 8360083 (Fed. Cir. Dec. 4, 2023) ...................... 1, 22, 23

*X2Y Attenuators, LLC v. Int'l Trade Comm'n*,
   757 F.3d 1358 (Fed. Cir. 2014) ........................................................................... 13

**Statutes**

Fed. R. Civ. P. 50 ...................................................................................................... 2

Fed. R. Civ. P. 59(a)(1)(A) ....................................................................................... 2

**Other Authorities**

Wright & Miller, Fed. Prac. & Proc. § 8044 ............................................................ 23

iii

## I.     INTRODUCTION

The evidence at trial showed two radically different approaches to discerning geospatial information from biological samples: spatially targeted *delivery* of probes with indiscriminate removal, and indiscriminate delivery of probes with spatially targeted *removal*.   The only reasonable conclusion to draw from the evidence is that Plaintiffs did not invent—and the Asserted Patents[1] do not describe—a method involving spatially targeted *removal* of probes.   To the extent the Asserted Patents claim methods beyond spatial delivery, they are invalid for lack of written description.   This is because the only reasonable conclusion for a jury to draw from the evidence at trial is that the Asserted Patents' specification describes only spatial *delivery* and there is thus a fatal mismatch between the Asserted Patents' specifications and their claims.   Alternatively, the Court could revisit its claim construction to clarify that the Asserted Patents claim only methods involving spatial delivery (not spatial removal), and accordingly that there is no infringement by NanoString. One way or the other, the jury's verdict cannot stand.   Even assuming validity and infringement, Plaintiffs' damages case is rife with "readily identifiable error" of the sort the Federal Circuit has regularly (and recently) cited to reject similar awards.  *VLSI Tech. LLC v. Intel Corp.*, No. 2022-1906, 2023 WL 8360083, at *10 (Fed. Cir. Dec. 4, 2023).   The Court should grant judgment as a matter of law to NanoString or, in the alternative, order a new trial.

## II.    BACKGROUND

Plaintiffs 10x Genomics, Inc. and Prognosys Biosciences, Inc. (together "10x") sued Defendant NanoString Technologies, Inc. for infringement of numerous claims of the Asserted

---

[1] U.S. Patents 10,472,669 (the "'669 Patent"), 10,961,566 (the "'566 Patent"), 10,983,113 (the "'113 Patent"), 10,996,219 (the "'219 Patent"), 11,001,878 (the "'878 Patent"), 11,008,607 (the "'607 Patent"), 11,293,917 (the "'917 Patent").

Patents.  NanoString disputed infringement and argued that the Asserted Patents are invalid for lack of written description.

A five-day trial began on November 13, 2023.  On November 17, 2023, the jury returned its verdict.  D.I. 309.  The jury found for 10x, finding direct and indirect infringement of all Asserted Patents, and that NanoString willfully infringed; finding that all Asserted Patents are not invalid for lack of written description; and awarding 10x damages of $25,611,347.20 in lost profits and $6,061,306.62 as a reasonable royalty at a rate of 12.5%.  *Id.*

## III.   LEGAL STANDARD

A court may grant judgment as a matter of law ("JMOL") when "a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." *Gardner-Lozada v. SEPTA*, 643 Fed. Appx. 196, 198 (3d Cir. 2016) (quoting Fed. R. Civ. P. 50).  The Court must consider "whether, 'viewing the evidence in the light most favorable to the verdict, a reasonable jury could have found for the prevailing party.'" *Id.* (citation omitted).  A court may grant a new trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court," Fed. R. Civ. P. 59(a)(1)(A), and should do so "when the great weight of evidence cuts against the verdict and … a miscarriage of justice would result if the verdict were to stand." *Leonard v. Semtech Int'l Inc.*, 834 F.3d 376, 386 (3d Cir. 2016) (cleaned up).

## IV.   ARGUMENT

### A.   The Court Should Grant JMOL of Invalidity for Lack of Written Description or, Alternatively, Order a New Trial.

"[T]he written description must lead a person of ordinary skill in the art to understand that the inventors possessed the entire scope of the claimed invention." *Juno Therapeutics, Inc. v. Kite Pharma, Inc.*, 10 F.4th 1330, 1335 (Fed. Cir. 2021).  "A mere wish or plan for obtaining the

claimed invention is not adequate." *Id.*   Rather, the patent's specification must "reasonably convey[] to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date." *Id.* (citations omitted).   Where "substantial evidence does not support the jury's finding of adequate written description," the Court must grant JMOL of invalidity.   *Id.* at 1336; *see id.* at 1342 (reversing denial of JMOL).

Here, substantial evidence does not support the jury's finding of adequate written description.   The only reasonable conclusion to draw from the evidence at trial is that a person of skill in the art would understand that spatial patterning upon *delivery* is integral to the invention and that the inventor did not possess a method for spatial *removal*.   Yet the claims (as previously construed by the Court, D.I. 207) were not limited to spatial delivery.   Because nothing in the overbroad claims vindicates the narrower teachings of the specification, the claims lack adequate written description.   Plaintiffs' evidence to the contrary, presented principally through the testimony of Dr. Satija, is many steps removed from the specification's actual text.   It does not suffice to show that a skilled artisan would understand from the specification that the inventor invented methods beyond spatial delivery.

The only reasonable conclusion to draw from the evidence is that spatial delivery is integral to the claimed invention. The Asserted Patents' abstract says as much explicitly, describing the "present invention" as "providing an assay system comprising an assay … where reagents are *provided to a biological sample in defined spatial patterns*" and "instrumentation capable of *controlled delivery of reagents according to the spatial patterns*."   JTX 7 ('607 patent) at Abstract (emphasis added).   The specification makes this same point again and again, describing "spatial patterning of reagents *onto* the biological sample" as "[*i*]*ntegral* to the assay system of the

3

invention." *Id.* at 16:13-15 (emphasis added); *see, e.g.*, *id.* at 21:62-65 ("The *primary criteria* of such reagent delivery systems is the ability to direct *delivery* of specific agents based on *spatial patterns* on the substrate surface." (emphasis added)); *see generally* D.I. 233 at 1-2 (collecting many more examples). The inventor, Dr. Chee, admitted as much at trial. *See* Tr. 177:9-12. And Dr. Edwards—a person of skill in the art—testified to his detailed review of each and every section of the Asserted Patents' specification. *See* Tr. 735:8-753:16 (walking through the patent section by section). He concluded that "the specification … teaches *only the delivery* of reagents in a spatial pattern to detect and determine mRNA in a tissue." Tr. 753:21-23.

The evidence further showed that the specification does not describe—and the inventor did not invent—methods involving spatial *removal*. As Dr. Edwards put it, "[t]he specification never describes targeted removal as a way to detect and determine mRNA in a tissue sample." Tr. 754:1-2. Rather, the specification discloses only bulk removal. This is logically consistent with the teaching of targeted delivery as integral to the invention: Once the encoded probes are introduced to the tissue sample according to the spatial pattern, indiscriminate removal is all that is needed to discern the desired geospatial information. Targeted removal would be redundant of the targeted delivery that is integral to the invention. Dr. Edwards analyzed and testified to each of the "five disclosures of removal in the specification" and concluded that "they're all taught to do [removal] in a bulk manner." Tr. 733:1-11; *see, e.g.*, JTX 7 at 9:2-11 (explaining that the removed probes are "removed and pooled"). The only reasonable conclusion to draw from the evidence is that a skilled artisan reading the patent specification would have concluded that the inventor did not possess any spatial analysis approaches that do not rely on spatially patterned delivery of encoded probes onto the tissue sample. Because, however, the claims reach broader than spatial delivery,

4

they lack adequate written description.

There is not sufficient record evidence to support a contrary conclusion.  10x relied on the testimony of Dr. Satija to bridge the gap between the specification's narrow focus and the claims' broad reach.  But Dr. Satija's testimony bore little connection to the specification's text.  Slide after slide of Dr. Satija's presentation did not cite to the specification at all.  *See, e.g.*, Tr. 954:14 ("There is no citation on this slide."); Tr. 954:22 ("There is no specific citation on the slide"); *see also* 955:2-955:18 (same for many more slides).  Worse still, when Dr. Satija did refer to the specification, it was only to mischaracterize it.  For example, Dr. Satija titled one slide "Spatial Patterning Through Delivery *or Removal*," but misleadingly cited a portion of the specification addressing only delivery that came from a section titled "Reagent Delivery Systems."  Tr. 957:13-959:22 (emphasis added).  Dr. Satija tried to account for this disconnect by testifying that "[j]ust like if I have a food delivery service, it also has to pick up food originally from the restaurant," "a person of ordinary skill in the art would recognize that instruments that can perform delivery can also perform removal."  Tr. 958:17-20.  Dr. Satija's *ipse dixit* is unreasonable on its face and does not even purport to draw any support from the specification.  It cannot support a jury conclusion that the disclosure in the Asserted Patents' specification supports the full breadth of their claims.

Relying on Dr. Satija's unsupported testimony, Plaintiffs cited three specific concepts plucked out of the specification to somehow show that a person of skill in the art would understand the specification to describe methods beyond spatial delivery: (1) the mention of segmentation; (2) the mention of pumps; and (3) the mention of sample indexing.  *See generally* Tr. 954:1-955:18. But none of these concepts remotely supports Plaintiffs' theories, let alone overcomes the specification's overwhelming teaching of spatial patterning delivery of encoded probes.  No

reasonable jury could rely on Dr. Satija's imaginative attempts to expand the specification's reach

to encompass methods many steps removed from what the inventor actually invented and disclosed

in the specification.

*1. Segmentation*:  Plaintiffs contend that the specification teaches methods without spatial

patterning delivery of encoded probes because it purportedly discloses segmentation methods that

can be used for targeted removal.  This theory is unsupported.  The relied-upon passage from the

specification is JTX-0008, 16:41-45.  But this portion of the disclosure is unambiguously directed

to spatially patterned *delivery* of encoded probes.  It mentions nothing about removal and, instead,

appears in a discussion of application of "instruments that can be used for the *deposition of* agents

… *onto* biological samples."  *See, e.g.*, Tr. 759:5-760:22.  This excerpt, moreover, is taken from

the section of the specification entitled "Reagent ***Delivery*** System."  *See, e.g.*, Tr. 760:17-763:17;

*see also* JTX-0008, 16:6.  And, just a few lines above the passage, the specification repeats that

"***[i]ntegral*** to the assay system of the invention is instrumentation that allows for ***spatial patterning***

***of reagents onto*** the biological sample."  *See, e.g.*, Tr. 760:17-763:17; *see also* JTX-0008, 16:21-

23.  It would have been unequivocal to a skilled artisan that the passage describes methods for

*delivering* encoded probes to the segmented tissue sample, not using segmentation to discern

geospatial information based on spatial removal.  *See, e.g.*, Tr. 759:5-760:16.  The invention

disclosure of the Asserted Patents corroborated this understanding.  *See, e.g.*, Tr. 763:18-765:25.

The inventor, too, confirmed that the segments described in the specification are created on the

tissue sample such that coding tags bearing location information can be delivered to the sample—

that is, the essence of spatial delivery—according to the pattern formed by the segments.  *See, e.g.*,

Tr. 183:24-185:24.

Dr. Satija cited segmentation as "an example of targeted removal," testifying that "a user can go to an individual segment; it can suck up the material; and it can transfer it onto its corresponding barcode" and thus that "you're doing the spatial barcoding step off of the tissue." Tr. 938:22-939:3.  But Dr. Satija's "mere wish or plan" for using segmentation in this distinct way cannot be reconciled with the specification's unambiguous teaching that the inventor described segmentation only in connection with targeted delivery. *Juno Therapeutics, Inc.*, 10 F.4th at 1337. Dr. Satija may, with the benefit of hindsight, hypothesize methods by which some other inventor might have used a different segmentation technique in connection with spatial removal and jettison the spatial delivery technique that lies at the heart of the Asserted Patents' specification.  But his testimony cannot support the conclusion that the Asserted Patents' specification itself reasonably conveys that the inventor actually invented such a method.

*2. "Bidirectional" Pumps*:  Plaintiffs next attempt to shoehorn spatial removal into the specification by obliquely relying on a passage at JTX-0008, 27:44-53 about the general working mechanism of pumps.  As Dr. Satija put it, "pumps can operate bidirectionally," which "demonstrates that the instruments in Dr. Chee's patent are capable of doing multiple things," and because "[i]f you apply a negative pressure [to the pumps], you're going to be removing material from the tissue," then "[t]hat's an example of targeted removal."  Tr. 941:7-25.

Dr. Satija's musings about two-way pumps, however, are too distant from the specification to reasonably support the conclusion that the inventor invented methods of geospatial patterning based on targeted removal.  As Dr. Satija admitted, this generalized description of pumps is (like the specification's reference to segmentation) taken from the section of the specification entitled "Reagent *Delivery*."  And, in that section, the specification expressly required that "[t]he reagent

7

delivery system of the invention can be any system that allows *the delivery of reagents to discrete portions* of the array in order to keep the integrity of the *defined spatial patterns* of the encoding scheme." *See, e.g.*, Tr. 959:15-961:24; JTX-0008, 27:5-9. So even if the pumps could hypothetically be used in connection with some other method involving targeted removal, such usage is not disclosed (or remotely suggested) by the specification. For written description, it is not sufficient "that the disclosure, when combined with the knowledge in the art, would lead one to speculate as to modifications that the inventor might have envisioned, but *failed to disclose*." *Lockwood v. Am. Airlines, Inc.*, 107 F.3d 1565, 1572 (Fed. Cir. 1997) (emphasis added). No reasonable juror could find that the mere mention of pumps can overcome the overwhelming teaching of spatial patterning delivery of encoded probes.

*3. Sample Indexing*: Finally, Plaintiffs cannot overcome the Asserted Patents' inadequate description by relying on "sample indexing," which—according to Plaintiffs—can be used to encode location information off-tissue and thus supports the conclusion that the inventor invented and disclosed such a method. The theory is meritless. Sample indexing is not once disclosed in the specification for any purpose, let alone for encoding location off tissue. *See, e.g.*, Tr. 773:22-776:8. Plaintiffs relied upon a passage at JTX-0008, 13:1-6, which mentions adding sequencing adaptors or primers. But the passage says nothing about using the sequencing adaptors or primers *to encode location information*, which is the fundamental work that Plaintiffs need the specification to do. *See, e.g.*, Tr. 809:11-21, 832:11-833:9. As part of discussion of Figure 3, the cited passage addresses only adding sequencing adaptors or primers to oligonucleotide probes *that already bear location coding tags. See, e.g.*, Tr. 737:10-738:6, 751:11-25. Sequencing is used to *identify* the coding tags, not to *make* new coding tags to encode location information in the first

8

instance. *See, e.g.*, Tr. 776:9-23. Further confirming that the inventor did not invent such a method as of the priority date, Plaintiffs' own expert could not testify to when researchers first started using sample indexing with sequencing. *See, e.g.*, Tr. 975:22-976:11.

Another passage Plaintiffs rely on in an attempt to bridge this gap is JTX-0008, 10:11-33, which, as part of description for step 140, mentions "adding a new tag." *See, e.g.*, Tr. 766:1-768:19. But again, this stray reference in the specification does not teach encoding location information and does not remotely contemplate an approach without spatial delivery. The cited passage is part of the description of Figure 1, which indisputably relies on spatial patterning delivery of encoded probes. *See* Tr. 767:5-768:19. And the specification is clear that the referenced tag is *not* a location coding tag. Rather, it is a tag used to facilitate step 140—"encoded probes that interacted with the biological targets must be separated from the encoded probes that did not interact with the biological targets." *See, e.g.*, Tr. 768:20-772:24. Plaintiffs' reliance on this passage about "adding a new tag" as supporting an approach where location information is added off tissue after the probes are collected is nonsensical. *See, e.g.*, Tr. 766:1-768:19.

Given the specification's thoroughgoing reliance on spatial delivery—which, according to the specification, is "integral" to the invention—it is hardly surprising that Plaintiffs were unable to find any basis from which a jury could reasonably conclude that the inventor invented methods other than spatial delivery. Yet nothing in the claims (under the Court's pre-trial constructions) refers to or imposes such requirements. This mismatch establishes that the inventor was not in possession of his overbroad claims and that the Asserted Patents are invalid for failure of written description. As the Supreme Court explained over a century ago, where "a useful result is produced in any art, manufacture, or composition of matter by the use of certain means for which

9

the inventor or discoverer obtains a patent, it is … too plain for argument, that the means described must be the essential and absolutely necessary means, and not mere adjuncts which may be used or abandoned at pleasure." *Russell v. Dodge*, 93 U.S. 460, 462 (1876).

The Federal Circuit has repeatedly followed this rationale to invalidate claims pursuant to the written description requirement in circumstances little different from those here. *See, e.g.*, *Gentry Gallery, Inc. v. Berkline Corp.*, 134 F.3d 1473, 1479 (Fed. Cir. 1998) (finding failure of written description for claims directed to furniture with controls off the console where "the original disclosure clearly identifies the console as the only possible location for the controls"); *Tronzo v. Biomet, Inc.*, 156 F.3d 1154, 1159 (Fed. Cir. 1998) ("[T]he '589 patent discloses only conical shaped cups and nothing broader."); *Rivera v. Int'l Trade Comm'n*, 857 F.3d 1315, 1321 (Fed. Cir. 2017) (The "question is whether a pod adaptor assembly intended to allow compatibility between distinct brewing systems, also supports an undisclosed configuration that eliminates a fundamental component of one of those systems (i.e., the 'pod') through integration. It does not."); *ICU Med., Inc. v. Alaris Med. Sys., Inc.*, 558 F.3d 1368, 1378 (Fed. Cir. 2009) (The "specification describes only medical valves with spikes… Based on this disclosure, a person of skill in the art would not understand the inventor of the '509 and '592 patents to have invented a spikeless medical valve"). This Court should do the same here.

As a final matter, the Asserted Patents also lack adequate description support for the claims' coverage of spatial methods or systems for *protein* analysis.  NanoString showed that the inventor of the Asserted Patents did not have possession of the claimed protein analysis.  *See, e.g.*, Tr. 756:1-9.  The only reasonable conclusion to draw from the evidence is that skilled artisans would have understood that it was far more challenging to work with proteins in 2011 and would

have recognized, based on the limited written description in the specification, that the inventor was not in possession of protein analysis as of 2011.  *See, e.g.*, *id.*  Indeed, the inventor's own statements in 2013 corroborated the challenges in working with proteins and acknowledged that he actually had ***not*** developed any protein assays at that time.  *See, e.g.*, Tr. 756:10-757:12.  This shortcoming presents an independent basis for JMOL of invalidity, and further illustrates the wide gulf between the Asserted Patents' sweeping claims and their much narrower specification.

At a minimum, the Court should order a new trial on invalidity.  The Court improperly excluded the testimony of Dr. Stacey Gabriel, Plaintiffs' withdrawn claim construction expert who was adequately disclosed and not cumulative.  D.I. 279 at 4-5.  Dr. Gabriel testified at claim construction (and would have testified at trial) that the specification does not disclose spatial removal—the very issue that is dispositive of written description.  For example, Dr. Gabriel testified that removal based on segmentation is "not described specifically," and agreed that "there's nowhere in the patent that says you should remove probes from discrete regions of segment[s] one by one as opposed to the tissue sample as a whole."  D.I. 172, Ex. 16 at 167:9-168:5.  And that was not all.  Dr. Gabriel also confirmed that nothing in the specification teaches applying tags off the tissue to encode location information.  D.I. 171 at 37.  And she concluded that methods not involving spatial delivery are "not actually written down as a single method" in the specification.  *Id.* at 38.  Over and over, Dr. Gabriel confirmed that the supposed "methods" Plaintiffs rely on are not, in fact, described by the specification.  *Id.*  The Court's blessing of Plaintiffs' decision to abandon Dr. Gabriel and rely on Dr. Satija was an error that resulted in a miscarriage of justice.  Moreover, the Court's written description jury instruction—which departed from the proposals of *both parties* and failed to instruct the jury that "possession" of the full scope

11

of the invention was required, Tr. 1011:14-18—was erroneous.  The trial evidence puts beyond

dispute that Mr. Chee did not possess the full scope of the claimed invention; the jury should have

been properly instructed on this requirement and given the opportunity to determine as much.

**B.    The Court Should Grant JMOL of Non-Infringement or, Alternatively, Order a New Trial.**

**1.    The Court Should Construe the Claims as Limited to Spatial Delivery.**

Alternatively, the Court can properly construe the claims to limit their scope in light of the

specification and the record testimony of persons of skill in the art.  That evidence supports only

one conclusion: that the claims should be limited to methods involving only spatial delivery and

do not extend to methods involving spatial removal.

The Court's task in claim construction is to determine the meaning of a claim term in the

eyes of a person of ordinary skill in the art "not only in the context of the particular claim in which

the disputed term appears, but in the context of the entire patent, including the specification."  *See*

*Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc).  Where an inventor "has

manifested that the invention does or does not include a particular aspect, that intention is regarded

as dispositive" and "the inventor has disavowed claim scope."  *Techtronic Indus. Co. Ltd. v. Int'l*

*Trade Comm'n*, 944 F.3d 901, 907 (Fed. Cir. 2019).

As NanoString argued at the Markman stage, the specification's limitation to spatial

patterning upon delivery and disavowal of any other method, including spatial removal, requires

construing multiple claim terms to appropriately reflect this limitation.[2]  The specification from

---

[2] Specifically, the implicated terms are "delivering a plurality of probes to a tissue sample" (claim 1 of '878, '113, '669, '219, and '467 patents), which NanoString argued required delivery "in a spatial pattern"; "reagent delivery system" (claim 1 of '917 patent), which NanoString argued referred to a system that can "immobilize a plurality of probes on a tissue sample in a spatial

beginning to end clearly and unmistakably reflects this restriction.  Even the abstract reflects this limitation.  It describes the "present invention" as "provid[ing] an assay system comprising an assay … where reagents are *provided to a biological sample in defined spatial patterns*" and "instrumentation capable of *controlled delivery of reagents according to the spatial patterns.*" JTX 7 at Abstract (emphasis added); *see Campbell Soup Co. v. Gamon Plus, Inc.*, No. 2020-2322, 2021 WL 3671366, at *4 (Fed. Cir. Aug. 19, 2021) ("We have previously held similar statements in the specification, such as 'the present invention includes,' 'the present invention is,' … to be clear and unmistakable statements limiting the scope of the claims.").  The specification elsewhere describes these limitations as "integral" to the invention.  *E.g.* JTX 7 at 16:13-15. This language is virtually identical to that which the Federal Circuit has found to disavow any broader claim scope.  *See X2Y Attenuators, LLC v. Int'l Trade Comm'n*, 757 F.3d 1358, 1362 (Fed. Cir. 2014) (describing a particular feature as an "essential element among all embodiments or connotations of the invention" sufficed to establish disavowal).  Dr. Edwards—a person of skill in the art—read "the specification [to] teach[] *only the delivery* of reagents in a spatial pattern" and to "never describe[] targeted removal."  Tr. 753:21-23, 754:1-2; *see* Tr. 735:8-753:16.  And, as explained above, Dr. Satija's attempts to assert a contrary view find no truck in the Asserted Patents' specification.

In ruling on claim construction, the Court erroneously disregarded Dr. Gabriel's testimony

---

pattern"; "generating" and "contacting a tissue sample with a plurality of probes" (claim 1 of '566 and '607 patents), which NanoString argued required creating probes on the tissue "according to a spatial pattern"; "sequence(s) of the oligonucleotide(s)" and "oligonucleotide having a sequence" (claim 1 of '878, '113, '669, '219, '467, and '917 patents), which NanoString argued should be interpreted as having an order that identifies a location in the tissue sample; and "removing the oligonucleotide from [the/a] region of interest"/"removing all or a portion of the oligonucleotide from a region of interest" (claim 1 of '878, '113, and '219 patents; claim 28 of '566 patent; claim 3 of '607 patent), which NanoString argued should be limited to indiscriminate removal of oligonucleotides from the tissue sample by elution.

and other extrinsic evidence, finding the "intrinsic evidence … sufficiently clear" to support Plaintiffs' constructions.  D.I. 207 at 4 n.4.  But the intrinsic evidence was instead clear in the other direction: the specification's unambiguous limitation to spatial delivery compelled the adoption of NanoString's proposed constructions.  At most, the intrinsic evidence was ambiguous and it was error to adopt 10x's constructions without considering extrinsic evidence, which even 10x believed was "[c]entral to the dispute," and which would have supported NanoString  *See* D.I. 171 at 34; *see generally Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 326 (2015).  For example, Dr. Gabriel testified unequivocally that methods not involving spatial delivery are "not written down" in the specification.  D.I. 171 at 38; *see supra* at 11-12 (collecting more examples).

The evidence at trial thus puts beyond dispute that a person of ordinary skill in the art would understand the Asserted Patents' claims to cover only methods involving spatial delivery and not spatial removal.  The Court should accordingly revisit its pre-trial claim construction, re-construe the claims accordingly, and grant JMOL of non-infringement because there was no dispute that if the claims are so construed then NanoString does not infringe.  At a minimum, the Court should order a new trial under a proper construction to avoid a miscarriage of justice.

The Court thus has two paths available to it, both of which lead to judgment for NanoString.  Either the Court can preserve its pretrial construction of the claims as not limited to spatial delivery and grant JMOL of invalidity because the Asserted Patents' specification lacks adequate description to support claims of such sweeping breadth.  Or else the Court can re-construe the claims in light of that specification as appropriately limited to spatial delivery and grant JMOL of non-infringement.  One way or the other, the conclusion is unavoidable that the trial evidence fails to support the jury's verdict.

14

### 2. Plaintiffs Failed To Prove Infringement Under the Pre-Trial Constructions.

Even if the Court does not revisit its prior claim construction, the evidence still does not suffice to show infringement under the Court's pre-trial constructions. As to the method claims of the '219, '669, '566, '113, '878, and '607 Patents, there is insufficient evidence from which a jury reasonably could find that use of GeoMx directly infringes, because the i5 and i7 indices in GeoMx assays that use an NGS readout do not satisfy the "determined sequence" or analogous limitation of those claims. *See* Tr. at 314:15-315:2.[3] As NanoString engineer Margaret Hoang testified, the i5 and i7 indices in GeoMx are used only to track the sample ID and demultiplex the sequencing run on the Illumina platform. Tr. at 290:9. Dr. Beechem, moreover, testified that the sequences in GeoMx do not include any information concerning the location of the region of interest, and there was no evidence to the contrary. Tr. at 651:19-24. Plaintiffs similarly failed to set forth any evidence that the "HYB code letter" in GeoMx assays for nCounter readout correspond to the claimed "sequence." Tr. at 334:2-7. As conceded by Dr. Quackenbush, the

---

[3] Claim 21 of the '219 Patent ultimately depends from Claim 1, which requires "using the determined sequence to determine the presence of the target biological molecule at the region of interest in the tissue sample." Claim 10 of the '669 Patent ultimately depends from Claim 1, which requires "using the determined sequence(s) to associate presence or abundance of the target biological molecule(s) with the location of interest of the tissue sample." Claim 17 of the '566 Patent ultimately depends from Claim 1, which requires "determining all or a portion of a sequence of the nucleic acid molecule or a complement thereof to detect the target protein and determine its associated location in the tissue sample." Claim 2 of the '113 Patent ultimately depends from claim 1, which requires "using the sequence to determine the presence or abundance of the target protein at the region of interest in the tissue sample." Claim 25 of the '878 Patent ultimately depends from claim 1, which requires "using the determined sequence of the oligonucleotide to determine presence or abundance of the target biological molecule at the region of interest in the tissue sample." Claim 17 of the '607 Patent ultimately depends from Claim 1, which requires "determining all or a portion of a sequence of the nucleic acid molecule or a complement thereof to detect the target mRNA and determine its location in the tissue sample."

HYB code letter is used to identify a well in the microtiter plate, not determine the presence or abundance of the target protein at the region of interest.  Tr. 334:2-335:11; *see* Tr. at 780:3-781:3. The only reasonable conclusion to draw from the evidence is that GeoMx determines "the presence of the target biological molecule" by capturing an image of the tissue sample to track the location of the target.  Tr. at 651:25-652:14; 777:7-781:9.

As for Claim 5 of the '917 patent, Plaintiffs failed to set forth sufficient evidence from which a reasonable jury could conclude that GeoMx meets at least three limitations. *First*, GeoMx DSP does not remove any "portion of the tissue sample from the region of interest," and instead only removes oligonucleotides during the aspiration step.  Tr. at 652:15-24; *see also* Tr. at 781:16-783:17.  *Second*, Dr. Quackenbush mistakenly asserted that GeoMx delivers "the removed portion of the tissue sample through the at least one reagent channel" because the oligonucleotides are allegedly "collected through the microcapillary tube."  Tr. at 310:10-16.  Dr. Beechem and Mr. Gray instead both testified that GeoMx aspirates oligonucleotides into the tip of a microcapillary. Tr. at 516:2-6; 651:9-18.  Dr. Quackenbush's testimony regarding "cross-contamination," Tr. at 350:15-19, cannot suffice to meet this limitation under the doctrine of equivalents because it bears no relationship to the language of the claim.  *See* Tr. 783:18-786:4.  *Third*, GeoMx does not deliver "an elution composition…to remove" portions of the tissue sample.  As explained by Dr. Beechem and Mr. Gray (and effectively admitted by Dr. Quackenbush), GeoMx removes oligonucleotides from the tissue sample not by delivering an elution composition but by shining UV light.  Tr. at 392:7-394:8, 516:2-18; 650:22-651:18.  Plaintiffs also failed to set forth sufficient evidence that GeoMx meets this limitation under the doctrine of equivalents. Dr. Quackenbush testified that the buffer solution functions to wash the region of interest (Tr. at 356:23-357:6), which is not the same

as claim 5's removal function. The Court should grant JMOL or order a new trial accordingly.

### 3.   Plaintiffs Failed to Prove Induced, Contributory, or Willful Infringement

Given that Plaintiffs failed to offer sufficient evidence of direct infringement, there can be no verdict of induced, contributory, or willful infringement.[4]  Even assuming infringement, there was insufficient evidence of (a) induced, (b) contributory, or (c) willful infringement.

**a.** As to inducement, Plaintiffs failed to set forth any evidence that NanoString knew that its induced acts constituted patent infringement or that NanoString engaged in culpable conduct. Tr. at 385:17-386:3; *see Bio-Rad Labs., Inc. v. Int'l Trade Comm'n*, 998 F.3d 1320, 1335 (Fed. Cir. 2021).  At most, Plaintiffs set forth evidence that NanoString knows that customers perform the GeoMx workflow and encourages them to do so (Tr. at 360:9-25; 361:17-364:12), but this is insufficient to demonstrate that NanoString "knew or should have known that the induced acts constitute patent infringement" and "possessed specific intent to encourage another's infringement." *Bio-Rad Labs.*, 998 F.3d at 1335.

**b.** As to contributory infringement, Plaintiffs failed to prove that "the accused product is not a staple article or commodity of commerce suitable for a substantial noninfringing use." *Id.* (citation omitted).  Plaintiffs' evidence on this issue consists solely of a single conclusory statement by its expert Dr. Quackenbush that GeoMx did not have "any kind of reasonable use" beyond those discussed in his testimony.  Tr. at 365:1-3.  This single statement without further elaboration is insufficient as a matter of law for Plaintiffs to meet their burden.

---

[4] *See, e.g.*, *Limelight Networks, Inc. v. Akamai Techs., Inc.*, 572 U.S. 915, 922 (2014) (induced infringement); *Linear Tech. Corp. v. Impala Linear Corp.*, 379 F.3d 1311, 1326 (Fed. Cir. 2004) (contributory infringement).

**c.** "[W]illfulness requires deliberate or intentional infringement." *Bayer Healthcare LLC v. Baxalta Inc.*, 989 F.3d 964, 988 (Fed. Cir. 2021). Willful blindness may substitute for willfulness only when a defendant "takes deliberate actions to avoid confirming a high probability of wrongdoing and who can almost be said to have actually known the critical facts." *Apeldyn Corp. v. AU Optronics Corp.*, 831 F.Supp.2d 817, 831 (D. Del. 2011) (citing *Global-Tech Appliances, Inc. v. SEB S. A.*, 563 U.S. 754, 769 (2011)). None of NanoString's witnesses, however, testified that NanoString knew it was infringing and Plaintiffs failed to set forth any evidence to the contrary. The evidence instead demonstrated that NanoString conducted a freedom to operate analysis prior to launching GeoMx (Tr. at 600:6-13), the Asserted Patents did not issue until after NanoString launched GeoMx (Tr. at 262:20-263:17), NanoString did not have knowledge of the Asserted Patents until one day before the filing of the Complaint (Tr. at 571:18-572:23), and NanoString reasonably believed that it did not infringe the Asserted Patents once it learned of them. Tr. at 777:4-786:4.

## C. The Court Should Grant JMOL of No Damages or, Alternatively, Order a New Trial.

The jury awarded Plaintiffs lost profits in the amount of $25.6 million and reasonable royalty damages in an amount of $6.1 million, reflecting a 12.5% royalty rate. Tr. 1109:5-18. It was Plaintiffs' burden to prove damages that reflected the value of the Asserted Patents and Plaintiffs failed to carry that burden. *Omega Patents, LLC v. CalAmp Corp.*, 13 F.4th 1361, 1377 (Fed. Cir. 2021). Neither award has adequate support in the evidence at trial and the Court should enter JMOL finding no damages or, at a minimum, order a new trial on damages.

### 1. There Was Insufficient Evidence of Plaintiffs' Lost Profits Damages.

Plaintiffs sought an amount of lost profits damages equal to *all* consumables sales by

18

NanoString from May 6, 2021, including customers who bought "protein products … and the other consumables" (but excluding customers who "bought protein only").  Tr. 475:2-4 (Davis).  It was thus Plaintiffs' burden to prove that each and every sale of NanoString's GeoMx was a lost sale for 10x and that 10x had the capacity to accommodate that significant increase in its sales. Plaintiffs were unable to offer any evidence—much less sufficient evidence—to support these fundamentally flawed assumptions.

*First*, no reasonable jury could have concluded that 10x would have captured each and every consumable sale by NanoString.  Plaintiffs' failure of proof on this score is glaring.  Ms. Davis assumed that 10x would capture *all* of NanoString's consumables revenue without assessing on a product-by product basis which 10x products could actually substitute for NanoString's sales and without evidence showing that consumers for each of the various products had no other alternatives.  Notably, 10x failed to offer evidence of *any* customer surveys or depositions to this end.  *See* Tr. 475:24-476:25.  Plaintiffs utterly failed to carry their burden to prove "the absence of an acceptable, non-infringing alternative" and that all of NanoString's customers were willing and able to switch to 10x products.  *Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*, 875 F.3d 1369, 1380 (Fed. Cir. 2017) (citing *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152, 1156 (6th Cir. 1978)).

The evidence instead showed that the opposite was true:  It was undisputed that certain consumers would have been unwilling or unable to purchase 10x products and that there were a number of other, non-infringing alternatives on the market.  The evidence showed that "there are important differences between these products," which raised questions "whether or not the scientists who use [NanoString] instruments would, in fact, use the Visium products in lieu of the

GeoMx products." Tr. 892:1-6.[5]  More generally, the evidence—in particular, the deposition of Mr. Rao, Tr. 877:7—showed that there were specific applications of GeoMx for which 10x did not offer a comparable product at all.  Especially in the absence of any evidence of consumer preferences, no reasonable jury could assume that every single consumer of NanoString products would have switched to 10x products when the products had critically different features.  Moreover, there was evidence of financial barriers that would have prevented certain consumers from switching, because "the operating budgets would be different for the two products" and "[s]ome people have capital expenditure budget" that they could use on one product but not the other.  Tr. 893:9-13.

Even for customers who were willing and able to purchase 10x products, there was evidence of other non-infringing alternatives—which alone undermines the lost profits damages verdict.  *See Presidio Components*, 875 F.3d at 1380 (It is a patentee's burden to "prove either that the potential alternative was not acceptable to potential customers or was not available at the time.").  The trial evidence showed that "there are companies out there in the marketplace that both companies … believe are competitors."  Tr. 894:8-13.  10x even trained its own sales force on a variety of competitors to Visium beyond NanoString.  Tr. 478:11-15.  In an attempt to overcome the undisputed proof of these non-infringing alternatives, Plaintiffs offered evidence showing only that NanoString did not "worry about competition" from these alternatives.  Tr. 920:23-921:4.  But NanoString's abstract concerns about competition cannot show whether these alternatives would

---

[5] For example, "the NanoString product has the ability to preselect a region of interest," allows for sample preservation, and is compatible with the nCounter machine—all features that are "important to a number of the researchers" but that the 10x products lack.  Tr. 892:7-893:8.

have captured even a single sale in a world where NanoString was unavailable. Indeed, that assumption was directly disproven by Mr. Lasinski's testimony "that there are certainly documents in the record that show specific sales that they have lost." Tr. 921:15-17.[6] Given the various reasons consumers might not have purchased 10x products and the evidence of available alternatives, no reasonable jury could have adopted Plaintiffs' blunt and incorrect assumption that 10x would have captured each and every one of NanoString's consumables sales.

*Second*, even assuming 10x would have captured all of NanoString's sales, no reasonable jury could find that Plaintiffs showed "manufacturing and marketing capability to exploit the demand" or reasonably quantified "the amount of profit that would have been made." *Presidio Components*, 875 F.3d at 1380 (citing *Panduit*, 575 F.2d at 1156). Capturing all of NanoString's sales would have amounted to a *50% increase* in 10x's consumables sales. Tr. 488:24-489:3. Yet Plaintiffs assumed that "[o]ther than the fixed sales commission" and the cost of goods sold, there would not be "any amount of money extra that [10x] would have to pay to grow [its] business 50 percent." Tr. 489:23-490:1. This assumption of zero additional cost for 50% additional sales is unreasonable on its face. And Ms. Davis did not offer substantial evidence to support this unreasonable assumption. Ms. Davis did not even quantify the number or type of additional units 10x would sell, thus offering no reasonable basis for the jury to conclude that 10x had adequate manufacturing and marketing capacity to sell an unknown number of unknown units. That "10x has always been able to meet whatever demand is faced" or had a large sales force (Tr. 421:18-21,

---

[6] Plaintiffs also offered evidence that certain of these competitors could perform only protein analysis. *See, e.g.*, Tr. 921:24-922:2. But since Ms. Davis included in her analysis customers who bought "protein products … and the other consumables," it is not reasonable to conclude that not a single one of these customers would have turned to these competitors for protein-related purchasing—especially since 10x's Visium lacked this feature at the time. Tr. 474:23-475:13.

488:24-489:3) cannot reasonably support the conclusion that 10x had the capacity to respond to vastly increased demand at no additional cost.  This is especially so given evidence that 10x's production facilities were already "running at like 86 percent capacity," Tr. 895:2-3, and of the need to hire additional salespeople to meet massively increased demand, Tr. at 895:25-896:3.

Plaintiffs' lost profits damages thus rest on a pair of unsupported assumptions that 10x *would* have captured all of NanoString's consumables revenue and that 10x *could* have done so at no additional cost.  Plaintiffs failed to offer sufficient evidence to justify either of these assumptions, much less both.  And there was instead uncontroverted record evidence disproving them.  The jury's lost profits verdict lacks support and the Court should enter JMOL accordingly.

### 2. There Was Insufficient Evidence of Plaintiffs' Reasonable Royalty Damages.

Plaintiffs also failed to prove their entitlement to reasonable royalty damages because Ms. Davis' proposed royalty rate suffered from two fundamental, "readily identifiable error[s]." *VLSI Tech.*, 2023 WL 8360083, at *10.  *First*, Ms. Davis's royalty calculation rested on the unsupported premise that NanoString's margins on GeoMx were nearly 80% and its margins on services revenue were 100%.  Tr. 436:24-437:2, 484:5-10.  Ms. Davis failed to offer any evidence—much less substantial evidence—to support this unreasonable assumption.  Instead, Mr. Gray established (Tr. 508:12-509:6), as confirmed by NanoString's 10k filings (Tr. 479:10-25), that the company's gross margin is about *half* of what Ms. Davis assumed (approximately 50% percent).

Compounding this error, Ms. Davis's unreasonable margin estimates should not have come before the jury because they were introduced in summary form without satisfying the requirements of Federal Rule of Evidence 1006.  *See* Tr. 866:7-867:11; PTX 69.  Ms. Davis's purported summary "significantly mischaracterize[d] the contents" of any underlying financial information

and she failed to "identify the assumptions or shortcuts used to prepare the summary" and thus it was not properly admitted.  Wright & Miller, Fed. Prac. & Proc. § 8044.  In testifying to her purported summary, Ms. Davis said that she "created the document to summarize the data provided by NanoString," but failed to identify any of the assumptions underlying her facially unreasonable calculations.  Tr. 484:3-4.  Ms. Davis's made-up margins should have been excluded and, in any event, cannot support the jury's verdict.

*Second*, the jury's reasonable royalty award is unsupported for the separate and additional reason that Ms. Davis improperly relied on the 10x/ReadCoor acquisition, which was the acquisition of an *entire company* (rather than the licensing of specific patents) and did not relate to the patents in suit, Tr. 432:18-22.  Patentees bear the burden of proving damages that reflect only the value of their patents and do not sweep in other sources of value.  *See ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 869 (Fed. Cir. 2010) ("At all times, the damages inquiry must concentrate on compensation for the economic harm caused by infringement of the claimed invention.").  While "prices paid in actual licenses may have a proper role to play in valuing the patented technology at issue in a case," the requirement that "such licenses be 'sufficient[ly] comparab[le]' to the royalty proposed … often precludes use of other licenses that involve (only or even partly) technology other than the patented technology at issue in the case at hand."  *VLSI Tech.*, 2023 WL 8360083, at *9 (alterations in original) (citation omitted).

Ms. Davis, however, relied on a highly non-comparable transaction and ignored evidence of other, highly comparable ones—reaching an inflated 15% royalty rate that lacks sufficient support in the record and is the product of unreliable methods.  As a threshold matter, Ms. Davis disregarded highly comparable benchmarks in the record that would have led to a much lower

23

royalty rate for the hypothetical negotiation. Specifically, Ms. Davis disregarded a license between 10x and Prognosys for the actual patents-in-suit that specified a royalty rate of 0.25%. Tr. at 453:24-454:2. And Ms. Davis also disregarded record evidence of a royalty rate between 2 and 4 percent that ReadCoor had actually negotiated with Harvard for its 100-patent portfolio. Tr. 459:22. These highly comparable licenses much more closely reflect the value of the Asserted Patents. Ms. Davis's failure to adequately account for these closely comparable licenses renders her opinion unreliable and shows that no reasonable jury could have adopted it. *See, e.g., ePlus, Inc. v. Lawson Software, Inc.*, 700 F.3d 509, 522-23 (Fed. Cir. 2012) (affirming conclusion that expert opinion was "flawed and unreliable" where it "ignored the settlements that produced smaller rates" despite their close comparability to the hypothetical negotiation).

Ms. Davis ultimately based her royalty rate on the highly non-comparable ReadCoor acquisition, which no reasonable jury could conclude provided a reasonable royalty rate for a hypothetical negotiation for the Asserted Patents. The ReadCoor acquisition was a complex corporate acquisition in which 10x obtained an entire company with an early-stage platform (which formed the basis of the ultimate 10x *in situ* product) as well as the rights to license a portfolio of more than 100 patents. Ms. Davis admitted that she "d[id]n't know for sure" why the transaction was structured the way it was. Tr. 455:12. And she acknowledged that the transaction was structured to involve primarily stock whose valuation fluctuated significantly—undermining her claim that the transaction as a reliable estimate for the value of the Asserted Patents. Tr. 457:1-7. Ms. Davis, moreover, assumed that the entire value of "IPR&D"—which represented over 96% of the entire transaction value—could be attributed to the ReadCoor patent portfolio, even though "IPR&D" included *all* "in-process research and development," with value stretching far beyond

24

the patents.  Tr. 434:23.  And she assumed—again without support—that half of that value could be apportioned to the patents Dr. Quackenbush viewed as "foundational."  Tr. 374:16-23.  Dr. Quackenbush's technical expertise about those patents, however, cannot stand in for an *economic* analysis to determine their value, which Ms. Davis admitted she did not undertake.  *See* Tr. 464:2-4 ("I have adopted Dr. Quackenbush's view that they are foundational.  I do not have an independent opinion about that[.]").  Critically, Ms. Davis was unable to testify which (or how many) of those patents were needed to commercialize the technology, confirming her failure to understand and assess the patents' economic value.  Tr. 461:21-22 ("I don't know.").

At bottom, Ms. Davis abdicated her responsibility to apportion damages to account for only "the economic harm caused by infringement of the claimed invention," and there was not sufficient evidence in the record for the jury to determine a reasonable royalty rate for the Asserted Patents based on the ReadCoor transaction.  *ResQNet.com*, 594 F.3d at 869.  Unsurprisingly, Ms. Davis's reliance on this highly non-comparable transaction resulted in a royalty rate many times greater than the rate shown in the actual licensing agreements in the record.  *See, e.g.*, Tr. 460:1-5.  The lack of evidence showing the economic and technological comparability of the ReadCoor transaction to the hypothetical negotiation for the Asserted Patents should have been a basis for excluding Ms. Davis's reasonable royalty opinion and undermines the jury's damages verdict.  The jury's reasonable royalty verdict lacks adequate support and the Court should enter JMOL accordingly or order a new trial.

## V.        CONCLUSION

For the reasons set forth above and on the basis of the trial record, and as set forth at trial, NanoString respectfully requests that the Court enter judgment as a matter of law for NanoString or, in the alternative, grant a new trial on the issues set forth herein.

Dated: December 20, 2023

Respectfully submitted,

FARNAN LLP

/s/ Brian E. Farnan
Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
919 North Market St., 12th Floor
Wilmington, DE 19801
Tel: (302) 777-0300
Fax: (302) 777-0301
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

Edward R. Reines (admitted *pro hac vice*)
Derek C. Walter (admitted *pro hac vice*)
Karnik F. Hajjar (admitted *pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, CA 94065
Tel: (650) 802-3000
Fax: (650) 802-3100
edward.reines@weil.com
derek.walter@weil.com
karnik.hajjar@weil.com

Christopher Pepe (admitted *pro hac vice*)
Amanda Branch (admitted *pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
2001 M Street, NW, Suite 600
Washington, DC 20036
Phone: (202) 682-7000
Fax: (202) 857-0940
christopher.pepe@weil.com
amanda.branch@weil.com

Yi Zhang (admitted *pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
Phone: (212) 310-8000
Fax: (212) 310-8007
yi.zhang@weil.com
*Attorneys for Defendant*

26