IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| 10X GENOMICS, INC. and PROGNOSYS BIOSCIENCES, INC., <br><br> Plaintiffs, <br><br> v. <br><br> BRUKER SPATIAL BIOLOGY, INC., BRUKER NANO, INC., and BRUKER CORP., <br><br> Defendant. | C.A. No. 21-cv-653-MFK <br><br> **PUBLIC VERSION** |

# JOINT STATUS REPORT

As directed by the Court's Memorandum and Opinion (D.I. 370) entered on December 23, 2024, Plaintiffs 10x Genomics, Inc. and Prognosys Biosciences, Inc. and Defendants Bruker Spatial Biology, Inc., Bruker Nano, Inc., and Bruker Corp. submit this Joint Status Report.

The following issues are presented in this report:

I. The parties' positions on supplemental damages and interest calculations

II. The parties' positions on the proposed injunction carve out:

    A. The parties' positions on the appropriate royalty for the injunction carve outs

    B. The parties' positions on the definition of "On-Going Research" in the injunction carve out

    C. The parties' positions on whether Bruker must confirm that the on-going research carve out applies

    D. The parties' positions regarding ex-US sales of consumables

III. Bruker's notice of its forthcoming motion to stay pending appeal

1

I.  **SUPPLEMENTAL DAMAGES & RECALCULATION OF PREJUDGMENT INTEREST**

Pursuant to D.I. 370, on December 30, 2024, Defendants provided 10x with an aggregate accounting of revenues through December 20, 2024, and revenue projections through January 10, 2025.

    1.  **Plaintiffs' Calculations**

Plaintiffs' calculations for supplemental damages, recalculation of prejudgment interest based on Defendants' accounting, and recalculation of the daily rate for post-judgment interest pursuant to 28 U.S.C. § 1961(a) are reflected in the proposed final verdict, attached here as **Exhibit A**.[1] Plaintiffs' supplemental accounting calculations in support of the proposed final verdict are attached here as **Exhibit B**. The parties have conferred.

**Lost Profits Rate.** The calculation of lost profits was based on the jury's finding that Plaintiffs should be awarded an effective rate of 61.2% of the lost profits. *See* D.I. 370 at 41 ("10x asserts that that it is entitled to lost profits at ***an effective rate of 61.2 percent***" … "***The Court agrees.***"). Contrary to Bruker's argument, Ms. Davis did not "use[] the cumulative rate from the entire pre-verdict period." *See below*. She used the rate awarded by the jury and applied it to the more recent sales revenue, a simple calculation of 61.2% times profits, as briefed by 10x and awarded by the Court.

Bruker now argues, for the first time, that because 10x's *trial presentation* presented a profit margin of 84.6%, 10x should be made to perform a post-trial accounting of its more recent profit margins to determine a new effective lost profits rate. Bruker did not make that argument in its post-trial briefing. And Bruker offers no legal basis for why it would be appropriate to revisit

---

[1] A Word copy to be provided to the Court contemporaneously.

the jury's weighing of the evidence and arriving at an award of 61.2%. This joint status report is not the appropriate vehicle to re-argue the appropriate supplemental damages rate.

**Bruker's Inadequate Accounting.** The revenue accounting provided by Bruker for sales of accused products provided only aggregate data October 14, 2024, through January 10, 2024. *See* **Exhibit C**. This was a departure by Bruker from the quarterly data and transaction-level sales data that were provided before trial. Bruker's lack of appropriate accounting required Plaintiffs' expert to estimate damages and interest calculations as follows:

- Because Bruker failed to provide quarterly data, the aggregate sales reported from 10/14/23 through 12/20/24 and aggregate projections from 12/21/24 through 1/10/24 were assumed to be even over the periods for purposes of calculating pre-judgment interest.

- Because Bruker failed to provide transaction-level data, the sales reported by Bruker were assumed to be appropriately apportioned according to Plaintiffs' trial presentation of damages. For example, Plaintiffs' trial presentation for nCounter instrument sales were apportioned according to the mix of GeoMx v. nCounter assay kits. The accounting provided by Bruker was assumed to have similarly apportioned the nCounter instruments.

- Because Bruker failed to provide transaction-level data, the sales reported by Bruker were assumed to have already excluded any protein-only sales from the lost-profits calculations (but, if so, should still have been included in the royalty calculations).

The alleged "discrepancies" that Bruker raised in meet-and-confer are not Plaintiffs' errors. At best, the assumptions Ms. Davis made reflect Bruker's failure to provide a sufficient accounting.

### 2. Bruker's Position

Plaintiffs submitted a proposed final judgment with updated damages calculations. Bruker disputes the accuracy of these calculations, particularly for lost profits and royalties calculated from October 14, 2023 through January 10, 2025.

Plaintiffs' expert relies on stale data, which inflates the post-verdict lost profits award. At trial, Julie Davis calculated lost profits by taking NanoString's quarterly revenues and applying 10x's quarterly gross profit margin rate (minus 3% for commissions). In her post-verdict update, however, Davis uses the cumulative rate from the entire pre-verdict period (81.6%). This overstates the lost profits award because 10x's gross profit margin (including commissions) decreased over time, ███████████████████████████████████. Bruker's proposal is that post-verdict lost profits should be calculated using 75% of 10x's quarterly profit margin (consistent with the jury's verdict).

Contrary to 10x's assertion, the jury did not "find[] that Plaintiffs should be awarded an effective rate of 61.2% of the lost profits." Instead, the jury found that the correct measure of lost profits *through trial* was 75% of the amount requested by 10x. It would make no sense to calculate post-trial damages using post-trial revenue figures, but pre-trial profit figures.

There are numerous other discrepancies in Davis's post-verdict lost profits calculation. For the first time, Davis includes customers that only purchased protein-related products, even though 10x lacks a comparable offering. Davis previously excluded such customers in earlier calculations and should do so again.

There are also discrepancies in the royalty base in Appendix B, Schedule 2, in that Davis incorrectly assumes that all post-verdict nCounter customers are using the system for spatial analysis with GeoMx instruments, even though a significant number of nCounter customers are

4

not GeoMx users. She accounted for this for pre-verdict sales, but not for post-verdict. The royalty base should only include the fraction of customers that use both systems.

In response to these deficiencies, 10x (for the first time today) attempts to point the finger at Bruker for purportedly failing to provide the correct dataset. If 10x believed that the data Bruker provided was insufficient, it should have informed Bruker, rather than ignoring the problem and seeking unreasonable and unapportioned figures. Now that this issue has been brought to Bruker's attention, it is collecting the data 10x has requested which will allow a proper apportionment to be calculated within the next couple of days. As the parties discussed early today, the modified judgment with the correct calculations can then be provided to the Court.

## II. PROPOSED INJUNCTION ORDER

On January 2, 2025, Plaintiffs submitted their Proposed Injunction Order.[2] That order closely tracks the language of the proposed injunction orders submitted with Plaintiffs' briefing, D.I. 321-01 and D.I. 354-06. Responding to questions raised during meet and confer, Plaintiffs have revised the proposed injunction language as reflected in the redline attached as **Exhibit D**.[3]

### A. On-Going Royalties for Injunction Carveouts

#### 1. Plaintiffs' Proposal for On-Going Royalties

The Court did not rule on Plaintiffs' "alternative request for reasonable royalties" (D.I. 370 at 38). The Court did determine that a supplemental damages rate of 61.2% for lost profits should apply to consumable sales made between the jury verdict and the entry of final judgment. D.I. 370

---

[2] *See* January 2, 2025, email from Jason J. Rawnsley to Melissa Astell and Proposed_Order_Kennelly@ilnd.uscourts.gov.
[3] A Word copy to be provided to the Court's proposed order email address contemporaneously.

at 41. Because the proposed injunction permits certain on-going infringing uses, the appropriate on-going royalty rate for infringing uses is a ripe issue for the Court to decide.

Plaintiffs previously explained the justification for post-injunction royalties on the carved-out consumables for on-going research (D.I. 320 at 14-17) and will not repeat the entirety of those arguments here. The primary point is that the 25% ongoing royalty rate for permitted GeoMx consumable sales reflects the parties' bargaining position in a hypothetical negotiation for the on-going royalty rate. Had the permitted consumable sales occurred pre-verdict, they would fall into the lost profit bucket (which covers all GeoMx consumable sales) instead of the reasonable royalty bucket (which covers GeoMx and nCounter instrument sales and TAP services). The jury had determined that for every dollar of GeoMx consumable sales, 10x loses 61.2 cents of profits it would otherwise have made. During a hypothetical negotiation for the ongoing royalty rate, 10x would have no incentive to accept a royalty rate below 61.2% because it could just repeatedly sue Bruker to receive the same lost profit award. Bruker's 12.5% proposal simply does not pass muster under the hypothetical negotiation test. The proposed 25% is already much lower than a 61.2% royalty rate 10x would have gotten in a hypothetical negotiation. Defendants opposed this on-going royalty rate arguing financial stress before and during bankruptcy. D.I. 327 at 15-17. That argument is no longer at issue.

### 2. Bruker's Position[4]

In its post-trial briefing, Bruker contended that a royalty of no more than 12.5% was appropriate for all ongoing sales of consumables, consistent with the jury's verdict. D.I. 327 at 15-17; D.I. 309 ("12.5%" written on verdict). The Court did not resolve this dispute in its Order, *see* D.I. 370 at 37-38, and instead suggested that because the Court was ordering an injunction, it

---

[4] Bruker reserves its rights to challenge the scope of the injunction on appeal.

need not address the "alternative request for reasonable royalties." *Id.* The parties' dispute remains ripe, however, because the injunction permits certain sales under its proposed carve-out. Yet Plaintiffs included their sought-after 25% rate in their proposed injunction without comment.

Because the Court did not resolve this dispute, it would be inappropriate to summarily adopt Plaintiffs' proposed rate. As Bruker explained, *see* D.I. 327 at 15-17, this rate is unjustified and unsupported by the record. It arbitrarily doubles the jury's royalty rate without any support. *See* D.I. 320 at 14-15 (lacking citation to any fact or expert evidence). The Court should reject Plaintiffs' arbitrary 25% royalty rate. To the extent the Court wishes to impose an ongoing royalty for consumables, the jury's 12.5% rate is more appropriate.

### B. Definition of "Ongoing Research"

#### 1. Plaintiffs' Carve Out for Ongoing Research

The proposed injunction broadly prevents Bruker from selling GeoMx instruments and consumables because, as the jury found, virtually every GeoMx consumable sale takes a Visium consumable sale away from 10x. The Court agreed that "allowing NanoString to proceed with selling any GeoMx products" would harm 10x, and that 10x had "shown irreparable injury." D.I. 370 at 33. Because every continuing GeoMx consumable sale is a direct and irreparable loss for 10x, the carve out to permit pre-existing GeoMx users to complete their historical research is necessarily narrow. The Court considered the proposed injunction and summarized that "the proposed injunction permits customers who have installed GeoMx DSP Analysis Instrument before November 18, 2023, to finish their research and continue to purchase consumables from NanoString subject to a royalty rate." D.I. 370 at 37. Bruker now objects to the "Ongoing Research" concept, seeking instead to create a large loophole for all infringing customers to buy new infringing consumables for at least **6 to 7 years** and to do so without paying for 10x's lost profits.

None of Bruker's objections to the narrow injunction carve out merit weakening the injunction. First, the carve out is sufficiently clear for the parties, customers, and the Court to implement. The carve out covers "in-progress experiments or studies." A researcher is in a good position to characterize the boundaries of her "study." The proposed injunction does not preclude a multi-year study. Bruker's speculation about long or complex studies does not suggest that a researcher will be unable to accurately describe her study as one that started before the jury verdict. Bruker has not identified a single real-world example of a study that would be at risk under the injunction language.

Second, there is no meaningful dispute that new studies are not carved out from the injunction. Bruker questions whether the carve out should be interpreted to cover further "derivative" or "follow-up" studies. Bruker's own language shows that such new studies are not "in-progress" as of the jury verdict.

Third, there is no confusion about the injunction tying the date for "in-progress" research to November 18, 2023, the day after the jury verdict. The carve out protects researchers that started GeoMx studies before the system was formally found to infringe the patents in suit. The carve out does not limit researchers to using only consumables purchased before November 18, 2023; studies that were "in progress" as of that date as demonstrated by pre-verdict consumable purchases can be continued with new consumable purchases, if necessary. However, it would be unfair to 10x to treat all GeoMx projects that began after the jury verdict—and are thus in the realm of adjudicated willful infringement—as being able to take advantage of a pre-verdict carve out.

Fourth, as to Bruker's arguments about protein profiling, this Court already considered Bruker's arguments (and the submitted customer declarations asserting) that Visium may not be a perfect substitute for all GeoMx customers or all GeoMx uses and found that "[t]hough disruption

8

to consumers is not ideal, this is not a sufficient basis to permit continued infringement." D.I. 370 at 37 (citing *St. Jude Med., Inc. v. Access Closure, Inc.*, No. 08-CV-4101, 2012 WL 12919408, at *4 (W.D. Ark. June 4, 2012)). As this Court already found, imperfect overlap between Visium and GeoMx is not a basis to narrow the injunction to allow Bruker to continue its infringement.

Taken together, Bruker's arguments appear to be an attempt to expand the narrow carve out for historical research to allow Bruker to enable new infringement for 6-7 years at a reduced royalty rate of 25% (as Plaintiffs proposed for the narrow ongoing research carve out) or even 12.5% (as Bruker seeks for any carve out). That result would be directly contrary to both this Court's finding that 10x is irreparably harmed by Bruker's ongoing infringement and to the jury's finding that Bruker's infringing consumable sales cost 10x lost profits at an effective rate of 61.2%. If this Court were to expand the carve out as Bruker proposes (despite the finding that such broad ongoing infringement irreparably harms 10x), then such new sales should be treated as supplemental damages at the 61.2% lost-profits rate that this Court found applicable to consumable sales made between the jury verdict and the entry of final judgment. *See* D.I. 370 at 41.

### 2. Bruker's Position

Plaintiffs' proposed injunction defines "Ongoing Research" as "in-progress experiments or studies by Existing Instrument Customers involving GeoMx consumables purchased before November 18, 2023." Bruker disputes whether this definition is appropriate.

The proposed definition of "Ongoing Research" is ambiguous and creates significant risks of unintended consequences because research projects often span multiple phases and involve overlapping timelines. They rarely have clear delineations. This ambiguity raises substantial concerns about compliance, enforcement, and burden on third parties, including:

- **Lack of clarity on project boundaries**: Research projects in academic and institutional settings often encompass multiple, distinct but related experiments (e.g.,

9

graduate dissertations or multi-year collaborative studies which may all be part of a single grant received by researchers). It is unclear whether these related experiments would be treated as part of a single project or fragmented into separate studies under the proposed definition (e.g., an overarching project with three distinct phases, each with multiple experiments). This could result in researchers being unable to complete the experiments necessary to complete work for a funded research grant.

- **Confusion about extended research timelines**: Many research projects evolve over time, often expanding in scope or adapting to new findings. The proposed definition does not clarify how modifications to a project's timeline, scope, or focus would impact its qualification as Ongoing Research. Nor is it clear whether follow-up studies or derivative projects that build on earlier research would be permitted.

- **Applicability of the November 18, 2023 date**: The definition ambiguously ties Ongoing Research to "GeoMx consumables purchased before November 18, 2023," leaving it unclear whether the date restricts the project's start date, or suddenly introduces a requirement that consumables can only be used that were purchased before the verdict. Limiting Ongoing Research in this way substantially narrows the carve-out, effectively requiring researchers to have initiated their projects and purchased consumables before the November 2023 verdict. This is very different from the broader carve-out the parties briefed, and the Court relied on, which permitted the "sale of existing consumables to historical installed bases to complete ongoing research," D.I. 370 at 36.

- **High Plex Protein Profiling:** The proposed injunction improperly encompasses all GeoMx projects relying on its unique high-plex protein profiling capabilities. High-

plex protein analysis is a distinctive feature of GeoMx that Visium does not support. Plaintiffs previously excluded high-plex protein profiling from their damages calculations, and this capability should also be carved out from the scope of the injunction.

To ensure clarity, Bruker proposes a simpler and more practical carve-out: existing GeoMx instrument customers may purchase consumables for the life of their existing machine, which is generally limited to 6-7 years, as long as the ongoing royalty is paid. This modification eliminates the need to define or monitor the scope of Ongoing Research done by third parties and avoids bringing disputes to the Court over whether experiments qualify. The revision also ensures that legitimate customer use is supported without creating unnecessary administrative or compliance burdens. Separately, the use of GeoMx and related consumables and services for use in high-plex protein profiling, a capability 10x's product does not have, should be excluded from the proposed injunction.

### C. Requirement that Bruker Show that Permitted Consumables Sales Under the Carveout for Ongoing Research Are for Use with Ongoing Research

#### 1. Plaintiffs' Position

Plaintiffs' requested injunction (and the proposed injunction orders submitted with Plaintiffs' briefing, D.I. 321-01 and D.I. 354-06) offers Bruker an (optional) carve out, which Bruker can choose to use to continue selling infringing GeoMx consumables to Bruker's customers for use in those customers' ongoing research in the U.S. provided that: (a) Bruker agrees to pay an ongoing royalty of at least 25% for those sales and (b) Bruker chooses to work with such customers to obtain confirmation that the consumables being purchased are for use with ongoing research. D.I. 321-01 at 3-4; D.I. 354-06 at 3-4. Bruker now takes issue with the language that requires Bruker to confirm that each such sale "is for Ongoing Research by obtaining a statement in writing

11

from each Existing Customer describing how the intended use of the products meets the definition of Ongoing Research herein." D.I. 321-01 at 4; D.I. 354-06 at 4.

Plaintiffs' proposal presents no concerns about "deterring" or "impeding" "legitimate sales" or "legitimate customer uses" of Bruker's infringing products in connection with this carve out, as Bruker's position statement below suggests; all such sales and uses in the U.S. are all infringing, and this Court has found that the *eBay* factors all favor granting an injunction to bar these sales. D.I. 370 at 32-38. "Complete relief to the Plaintiff[s]" under the *Gentile* case Bruker cites would thus require eliminating this carve out, not expanding it as Bruker proposes.

The entire purpose of this (optional) carve out that Plaintiffs are offering to Bruker is to permit consumables sales in the U.S. that are in fact for use in completing ongoing research—and only sales for use in completing ongoing research. To take advantage of this carve out, Bruker must be required to show that this requirement is met for any such permitted sales, else this carve out could be expanded by Bruker to permit sales to U.S. customers for purposes other than the completion of ongoing research, which would irreparably harm Plaintiffs and lead to lost profits at an effective 61.2% rate that is much higher than the 25% royalty rate proposed for permitted ongoing research sales. Plaintiffs' proposal balances the desire of researchers to finish ongoing research against the need to limit continuing irreparable harm to Plaintiffs by reasonably allowing Bruker the option to obtain from customers to whom Bruker wants to sell infringing GeoMx consumables for use in ongoing GeoMx research projects "a statement in writing . . . describing how the intended use of the products" meets the definition of "Ongoing Research", that is, that the consumables are for use in "in progress experiments or studies" by an existing GeoMx instrument customer "involving GeoMx consumables" from before November 18, 2023. Plaintiffs' proposed injunction places restrictions on *Bruker* (not any of Bruker's customers) to comply with this carve

out should Bruker choose to take advantage of this carve out and is thus not a violation of FRCP 65(d)(2).[5]

### 2. Bruker's Position

Plaintiffs' proposed injunction requires Bruker, for each permitted consumables sale, to "obtain[] a statement in writing from each Existing Customer describing how the intended use of the products meets the definition of Ongoing Research." Bruker disputes the appropriateness and feasibility of these requirements.

Requiring a written explanation from customers of "how" the use of each consumable fits Plaintiffs' vague definition is unduly burdensome to third parties. This obligation compels non-party customers to act in violation of Rule 65(d)(2), which limits the persons bound by an injunction. The proposed injunction goes beyond regulating Bruker's conduct and improperly forces non-parties to provide written justifications for their compliance. Such an overreach risks deterring legitimate sales and creating unnecessary compliance barriers for researchers, including requiring them to disclose highly sensitive and confidential information about their research.

The proposal also exceeds what is necessary to remedy Plaintiffs' harm. "[I]njunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiff." *Sec. & Exch. Comm'n v. Gentile*, 939 F.3d 549, 560 (3d Cir. 2019) (quoting *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994)). Requiring written explanations from third parties is not narrowly tailored to achieve compliance. The proposed requirement would further burden Bruker to ensure customers provide sufficient written explanation—despite the lack of

---

[5] In addition, Bruker's customers will all receive actual notice of this injunction as required by the "III. NOTICE" provision, and thus those customers who work with Bruker to provide Bruker with a statement that purchased consumables are for use in ongoing research are persons who have received notice of the injunction and are in active concert or participation with Bruker as permitted under Rule 62(d)(2)(C).

clarity about what suffices—and creates an administrative hurdle that may deter legitimate sales and complicate enforcement.

Bruker can address Plaintiffs' concerns through a simpler approach. Limiting sales to approved customers and making all sales subject to the express restrictions of the injunction would achieve the same objectives without imposing unnecessary burdens on third parties. This achieves the injunction's objectives without burdening third parties or introducing unnecessary administrative complexity. It also ensures that legitimate customer use is not impeded and removes any ambiguity over what suffices as a "written explanation."

Bruker proposes the following language: Bruker will inform customers that sales of consumables are only available subject to the terms of the injunction and will add appropriate language to sales contracts with customers.

### D. Consumables Sold to Ex-US Customers

#### 1. Plaintiffs' Injunction Carve Out for Consumables to Ex-US Customers

The jury correctly found that Bruker's sales of US-made instruments to customers outside of the United States were infringing and the jury further awarded 10x royalties and lost profits on the convoyed sales of consumables to those customers for use in the infringing instruments. Bruker offered no argument in its post-trial briefing that would justify disturbing the jury's award on these consumable sales or any argument supporting a finding that continued consumable sales to ex-US customers that purchased infringing instruments should be permitted. Bruker's sales of GeoMx instruments to users outside the United States continues to constitute infringement, and any sale of consumables that are convoyed with that infringement are not exempt. Bruker did not argue at trial or in post-trial briefing that consumables convoyed with infringing instruments are not subject to injunction and Bruker should not be permitted to raise that argument now. In any case, even

aside from convoyed sales, Bruker is legally wrong that extraterritorial non-infringing sales are outside the reach of U.S. remedies. *See Brumfield v. IBG LLC*, 97 F.4th 854, 877 (Fed. Cir. 2024) (damages are permissible for foreign infringement where foreign conduct enabled and was needed to enable domestic profits). The *Wesley Jessen Corp* case cited by Bruker only stands for the proposition that export is not itself an infringing use in violation of an injunction, not that an appropriate injunction cannot restrict export of products that can only be used due to a past infringement. Defendants' reliance on a foreign Court's decision to not award an injunction in Europe on different patents and different accused products is misplaced.

Alternatively, Plaintiffs have proposed a carve out to allow Bruker to continue to sell consumables to those customers outside of the United States that purchased infringing instruments conditional on Bruker paying to Plaintiffs a 25% royalty on the net revenue Bruker receives from the Permitted Consumables Sales to Non-U.S. Customers. The 25% ongoing royalty is appropriate as described above and in detail in Plaintiffs' Opening Brief in Support of Their Post Trial Motion. D.I. 320 at 14-17.

### 2. Bruker's Position

The proposed injunction would enjoin Bruker from exporting consumables to scientists in foreign countries, except under the carve out provision.

The Court has "considerable" discretion to adjust the scope of an injunction. *See Groupe SEB USA, Inc. v. Euro-Pro Operating LLC*, 774 F.3d 192, 206 (3d Cir. 2014). Here, the Court should exercise that discretion to limit the impact of the injunction on research activities outside of the United States. Plaintiffs' proposed injunction would prohibit the export of consumables to customers outside of the U.S., except under the carve out provision. Exporting consumables is not infringement under § 271(a), "even if motivated by commercial interests." *Wesley Jessen Corp.*

*v. Bausch & Lomb, Inc.*, 256 F. Supp. 2d 228, 231 (D. Del. 2003).  Notably, in Europe, 10x has had two injunctions found to be legally unwarranted.  D.I. 369 (Notice of Supplemental Authority).

### III. BRUKER'S NOTICE OF FORTHCOMING MOTION TO STAY PENDING APPEAL

Bruker respectfully notifies the Court of its intent to file a motion to stay the injunction pending appeal under Rule 62 and to waive any bond requirement as unnecessary. Bruker will request an administrative stay while the Court considers the motion.

Plaintiffs will oppose.

Respectfully Submitted,

| | |
|---|---|
| RICHARDS, LAYTON & FINGER, P.A. | FARNAN LLP |
| | |
| */s/ Jason J. Rawnsley* | */s/ Brian E. Farnan* |
| Frederick L. Cottrell, III (#2555) | Brian E. Farnan (Bar No. 4089) |
| Jason J. Rawnsley (#5379) | Michael J. Farnan (Bar No. 5165) |
| Alexandra M. Ewing (#6407) | 919 N. Market St., 12th Floor |
| Gabriela Z. Monasterio (#7240) | Wilmington, DE 19801 |
| 920 North King Street | (302) 777-0300 |
| Wilmington, DE 19801 | (302) 777-0301 (Fax) |
| (302) 651-7700 | bfarnan@farnanlaw.com |
| cottrell@rlf.com | mfarnan@farnanlaw.com |
| rawnsley@rlf.com | |
| ewing@rlf.com | |
| monasterio@rlf.com | |
| | *Of Counsel*: |
| *Of Counsel*: | |
| | Edward R. Reines (admitted *pro hac vice*) |
| TENSEGRITY LAW GROUP LLP | Derek C. Walter (admitted *pro hac vice*) |
| Matthew Powers | Karnik F. Hajjar (admitted *pro hac vice*) |
| Paul Ehrlich | WEIL, GOTSHAL & MANGES LLP |
| Stefani Smith | 201 Redwood Shores Parkway |
| Robert Gerrity | Redwood Shores, CA 94065 |
| Li Shen | Tel: (650) 802-3000 |
| 555 Twin Dolphin Drive | Fax: (650) 802-3100 |
| Suite 650 | NanoString.10X@weil.com |
| Redwood Shores, CA 94065 | |
| Tel: (650) 802-6000 | Amanda Branch (admitted *pro hac vice*) |
| | Christopher Pepe (admitted *pro hac vice*) |
| Azra M. Hadzimehmedovic | Kristin Sanford (admitted *pro hac vice*) |
| Aaron M. Nathan | WEIL, GOTSHAL & MANGES LLP |
| Samantha Jameson | 2001 M Street, NW, Suite 600 |
| Ronald J. Pabis | Washington, DC 20036 |
| Kiley White | NanoString.10X@weil.com |
| Joanna R. Schacter | |
| 1676 International Drive | Natalie C. Kennedy (admitted *pro hac vice*) |
| Suite 910 | WEIL, GOTSHAL & MANGES LLP |
| McLean, VA 22102-3848 | 767 Fifth Avenue |
| Tel: (650) 802-6000 | New York, NY 10153-0119 |
| 10x_NSTG_Service@tensegritylawgroup.com | NanoString.10X@weil.com |
| | |
| *Attorneys for Plaintiffs 10x Genomics, Inc. and Prognosys Biosciences, Inc.* | Christine E. Lehman (admitted *pro hac vice*) REICHMAN JORGENSEN LEHMAN & FELDBERG LLP |
| Dated: January 7, 2025 | 1909 K Street NW, Suite 800, Washington, |

DC 20006
Tel: (202) 894-7310
Bruker-10X@reichmanjorgensen.com

Sarah Jorgensen (admitted *pro hac vice*)
REICHMAN JORGENSEN LEHMAN &
FELDBERG LLP
1201 West Peachtree Street, Suite 2300,
Atlanta, GA 30309
Bruker-10X@reichmanjorgensen.com

Courtland L. Reichman (admitted *pro hac vice*)
Savannah H. Carnes (admitted *pro hac vice*)
REICHMAN JORGENSEN LEHMAN &
FELDBERG LLP
100 Marine Parkway, Suite 300, Redwood Shores, CA 94065
Bruker-10X@reichmanjorgensen.com

*Attorneys for Defendants Bruker Spatial Biology, Inc. and Bruker Nano, Inc.*