# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| 10X GENOMICS, INC., et. al., | ) |
| Plaintiffs, | ) ) C.A. No. 21-cv-653-MFK |
| v. | ) ) **JURY TRIAL DEMANDED** |
| BRUKER SPATIAL BIOLOGY, INC., et al. | ) ) **FILED UNDER SEAL** |
| Defendants. | ) ) |

## BRUKER'S SUPPLEMENTAL BRIEF ON THE JANUARY 23 EVIDENTIARY HEARING

Dated: January 28, 2025

Christine E. Lehman (admitted *pro hac vice*)
Adam Adler (admitted *pro hac vice*)
REICHMAN JORGENSEN LEHMAN & FELDBERG LLP
1909 K Street NW, Suite 800,
Washington, DC 20006
Tel: (202) 894-7310
Bruker-10X@reichmanjorgensen.com

Sarah Jorgensen (admitted *pro hac vice*)
REICHMAN JORGENSEN LEHMAN & FELDBERG LLP
1201 West Peachtree Street, Suite 2300,
Atlanta, GA 30309

Courtland L. Reichman (admitted *pro hac vice*)
Savannah H. Carnes (admitted *pro hac vice*)
REICHMAN JORGENSEN LEHMAN & FELDBERG LLP
100 Marine Parkway, Suite 300,
Redwood Shores, CA 94065

Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
FARNAN LLP
919 North Market St., 12th Floor
Wilmington, DE 19801
Tel: (302) 777-0300
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

Edward R. Reines (admitted *pro hac vice*)
Derek C. Walter (admitted *pro hac vice*)
Karnik F. Hajjar (admitted *pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, CA 94065
Tel: (650) 802-3000
NanoString.10X@weil.com

Amanda Branch (admitted *pro hac vice*)
Christopher Pepe (admitted *pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
2001 M Street, NW, Suite 600
Washington, DC 20036

Natalie C. Kennedy (admitted *pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153-0119
*Attorneys for Defendants*

## TABLE OF CONTENTS

Page

I. BACKGROUND ...................................................................................................................2

    A. Events Leading to the Evidentiary Hearing. ...............................................................2

    B. The Evidence. ..............................................................................................................3

        1. Geomx Plays a Critical Role in Patient Care and Medical Research. ........................ 3

        2. Visium Is Not a Suitable Replacement for Geomx. .................................................... 5

        3. 10x's Proposed Definition of "Ongoing Research" Is Ambiguous. ........................... 7

        4. Geomx Sales Plummeted While Visium Sales Grew Significantly............................ 8

        5. With a 12.5% Royalty, ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇. ............... 9

II. ARGUMENT .......................................................................................................................10

    A. Injunction Scope ........................................................................................................10

        1. The Court Should Permit Consumable Sales to Existing Customers. ...................... 10

        2. Injunctions Must Specify the Enjoined Conduct. ..................................................... 13

        3. Customers and Vendors Should Not Be Subject to the Injunction. .......................... 13

        4. A Broad nCounter Exclusion Is Inappropriate. ........................................................ 13

        5. Compliance ............................................................................................................... 14

    B. Ongoing Royalty ........................................................................................................14

    C. Supplemental Damages ..............................................................................................15

III. CONCLUSION ..................................................................................................................15

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Int'l Rectifier Corp. v. IXYS Corp.*,
   383 F.3d 1312 (Fed. Cir. 2004) ...................................................................................... 13

*Paice LLC v. Toyota Motor Corp.*,
   504 F.3d 1293 (Fed. Cir. 2007) ...................................................................................... 14

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ............................................................................................................ 10

*XY, LLC v. Trans Ova Genetics*,
   890 F.3d 1282 (Fed. Cir. 2018) ...................................................................................... 15

**Rules**

Fed. R. Civ. P. 65(d)(1)(C) .................................................................................................... 13

Defendants Bruker Corp., Bruker Spatial Biology, Inc., and Bruker Nano, Inc. (collectively, "Bruker") respectfully submit this supplemental brief, as requested at the January 23, 2025 evidentiary hearing. D.I. 378. As requested, the injunction proposed by Bruker is attached hereto as Exhibit 1.[1]

The central question is the scope of the injunction on Bruker's sales of consumables used with GeoMX instruments, and the royalties to be paid to 10x Genomics, Inc. ("10x") on those sales. The decision comes down to weighing the healthcare of patients against possible financial harm to 10x. The Court heard testimony as to the seriousness of the issues—patients' healthcare will be jeopardized with the injunction 10x proposed. The serious patient implications were not disputed at the evidentiary hearing. This is not about Bruker making money. Sales of GeoMx instruments would still be enjoined. And on the proposed 12.5% royalty for consumables, ████████████████████████. The permanent injunction on sales of GeoMx instruments makes this a sunsetting product, obsolete within 3-6 years. Market forces will move customers away from GeoMx where feasible because the product will no longer be available (with the injunction in place). Those who cannot switch for healthcare reasons should have access to the technology in the interim.

Importantly, 10x acknowledged at trial that its products are not substitutable for Bruker's high-plex protein consumables. On those non-substitutable sales, the jury awarded a reasonable royalty of 12.5%. Since trial, the mix of products sold by Bruker has changed materially—namely, high-plex protein sales are now a much more significant percentage of sales. This only makes sense because customers who do not need the high-plex capability are switching away from the sunsetting GeoMx instrument, and it also makes sense because the new high-plex capability was only introduced at the

---

[1] Bruker submits the proposed injunction in response to the Court's request and in light of the post-trial order, D.I. 370, in which it found an injunction was appropriate. Bruker is not conceding that an injunction is appropriate, but is taking that as a given in light of the Court's order. The question here is the scope of an injunction order.

1

time of trial. The high-plex capability is particularly important to doctors and researchers. Today, these non-substitutable high-plex protein detection consumable sales are approximately 76% of what Bruker provides to customers for GeoMx instruments. That is, for 76% of sales, 10x has no substitute, and the jury awarded a 12.5% royalty. 10x provided no substantively contrary evidence at the hearing.

In sum, Bruker requests that the injunction permit sales of consumables for the installed base and that Bruker pay a reasonable royalty of 12.5% of net revenue on those sales. As shown below, the public interest is best served by permitting continued sales of consumables to customers who previously purchased GeoMx instruments (the "installed base"). Over time, doctors and researchers will find other solutions, but in the meantime, patient care must take precedence over 10x's desire to vindicate its patent rights—particularly while the case remains on appeal.

The other issues are straightforward. First, under controlling law, the injunction cannot bar "infringement," as 10x requested. Second, any compliance process should put the burden on Bruker, not require legal determinations by customers, who are not subject to the injunction. Third, the nCounter product should be enjoined only to the extent it is being used with the GeoMx products—other uses were not found to infringe. Finally, lost profits supplemental damages (between verdict and the final judgment) should be the actual profits lost by 10x, not inflated by $1 million, as 10x' requests.

I. BACKGROUND

    A. Events Leading to the Evidentiary Hearing.

In November 2023, a jury found Nanostring liable for willful patent infringement. D.I. 309. The parties briefed the request for permanent injunction based on information available in December 2023 and January 2024. D.I. 319, 327, 332. Nanostring submitted 22 declarations from scientists describing the importance of GeoMx for containing infectious diseases, cancer and disease treatment, and drug discovery. D.I. 328, Exhibits 2-23. After post-trial briefing, Nanostring entered bankruptcy

2

and was ultimately acquired by Bruker. D.I. 339. On December 23, 2024, the Court granted 10x's motion and instructed 10x to submit a proposed injunction. D.I. 370 at 41.

10x submitted a proposed injunction on January 7, 2025. D.I. 373-4. It sought to enjoin, among other things, "any product that infringes . . . including without limitation" the accused products. *Id.* at 2. It also forbade selling nCounter products "to any customer with a GeoMx instrument," even though nCounter is not independently infringing and has many noninfringing uses. *Id.* 10x proposed a carve-out for "ongoing research," defined as "in-progress experiments or studies by Existing Instrument Customers involving GeoMx consumables purchased before November 18, 2023." *Id.* at 3. Bruker noted that it disagreed with 10x's proposed order. D.I. 373.

The Court set an in-person evidentiary hearing "on all post-trial matters" for January 23. D.I. 375. The parties were required to present live witnesses for all disputed facts. Exhibit 2 (1/8/25 Hr'g Tr.) at 6:17-8:8. The parties disclosed witnesses in advance of the hearing and agreed on the numbers underlying the parties' competing proposals for supplemental damages. D.I. 376.

### B. The Evidence.

The Court heard testimony from four witnesses, reviewed 5 exhibits, in addition to the previously-submitted evidence (most notably, the 22 declarations), and heard arguments.

#### 1. GeoMx Plays a Critical Role in Patient Care and Medical Research.

Bruker's first witness, a physician-scientist at Northwestern Medical School, Dr. Parambir Dulai, testified about three specific ways he uses GeoMx to inform patient care: in a clinical trial to determine how patients respond to treatment, in the development of a diagnostic test to prevent potentially harmful steroid prescriptions, and in analyzing archival samples to understand how patients' symptoms change over time. Exhibit 3 (1/23/25 Hr'g Tr.) at 13:13-14:4 (clinical trial), 17:9-18:23 (diagnostic test), 22:24-23:22 (to "roadmap" disease progression).

3

Bruker's second witness, the director of precision oncology at the Knight Cancer Institute, Dr. Gordon Mills, testified about GeoMx's critical role in the SMMART trials, which personalize cancer treatments for hundreds of patients with non-curative cancer. Ex. 3 at 37:11-42:14. This work gives "real people" real hope. Ex. 3 at 37:11-41:2. For metastatic breast cancer, "where the cure rate essentially approaches zero" and chemotherapy prolongs disease-free survival by just weeks, through the use of GeoMx data, "we now have patients who have gone for more than five years without a recurrence of their disease." Ex. 3 at 41:15-42:7. GeoMx is the cornerstone for this approach. Ex. 3 at 46:5-48:3 ("most informative piece of information").

This testimony is representative of scientists and doctors worldwide. *See* Ex. 3 at 28:11-29:4 (Dr. Dulai explaining how an injunction would impact researchers in America, Asia, Europe, and beyond). As documented in 22 declarations, scientists rely on GeoMx across disciplines, countries, and patient populations to benefit public health. With just a few examples, GeoMx enables scientists to study how immune cells interact with breast cancer tumors (D.I. 328-20 at ¶¶ 5-6), select personalized cancer therapies for individual patients (D.I. 328-10 at 1), and compare the emerging COVID-19 virus to the 1918 Spanish Flu to better respond to a global pandemic (D.I. 328-13 at ¶ 4). One Danish scientist relies on GeoMx to predict which cancer patients will benefit most from either chemotherapy or surgery, a project started in 2024 with "tremendous clinical potential" that will involve "more than 500 patients." D.I. 328-12 at ¶¶ 2, 4, 7. This is a truly global impact.

A review of the transcript reveals that Dr. Smibert did not even address GeoMx. 10x's primary rebuttal was a suggestion that Dr. Mills' work may raise FDA compliance issues. Ex. 3 at 138:4-9 ("[T]here might be some issues that the FDA has to deal with for that use."). Not only is this assertion

false,[2] it is not before the Court for decision. As even 10x noted, that is an issue for the FDA. This does not refute the strong evidence that GeoMx is vital to patient care.

### 2. Visium Is Not a Suitable Replacement for GeoMx.

The evidence shows that Visium cannot currently replace GeoMx, especially for high-plex protein analysis, CLIA compliance, and making the most of scarce tissue samples. Dr. Dulai explained why GeoMx is essential for certain experiments and why Visium cannot suffice. *See* Ex. 3 at 13:12-15:17, 17:9-28:10. Visium's workflow requires "prescreening" tissue samples to ensure that they meet minimum quality thresholds. Ex. 3 at 22:24-25:14. This wastes a significant portion of limited, irreplaceable tissue. *Id.* (prescreening "often results in over 80 percent of the tissue being gone"); *see* 21:3-8 (Tissue samples can come from "young teens, sometimes children who are 5, 6 years old getting anesthesia to get colonoscopies."). Without GeoMx, patients and their doctors are deprived of critical insights into disease progression. Ex. 3 at 24:25-25:14 (explaining why not being "able to use those archive samples is a huge problem"). Dr. Dulai also explained that Visium cannot analyze protein expression on the same slide as RNA in the manner required for his work. Ex. 3 at 18:24-20:21. If GeoMx was unavailable, Dr. Dulai would have to forgo these types of experiments entirely. Ex. 3 at 22:17-18, 24:2-4; *id.* at 22:19-23, 24:21-24 ("I would choose to not do the test."). Even where technically viable, researchers still cannot substitute Visium mid-study due to grant restrictions, patient consent protocols, and widely differing data outputs of the two platforms. Ex. 3 at 25:15-27:16.

Dr. Mills similarly testified that GeoMx is irreplaceable in his work. GeoMx enables his team to analyze "a very specific set" of approximately 90 specific proteins simultaneously. Ex. 3 at 45:4-46:4. By contrast, Visium supports a maximum of 35 proteins, which does not even include the

---

[2] Dr. Mills explained that his organization adheres to federal regulations by using GeoMx under the Laboratory Developed Test (LDT) approach, which allows the use of GeoMx to inform treatment recommendations. Ex. 3 at 52:20-53:13.

proteins necessary for his work. Ex. 3 at 42:15-19, 45:8-11. This clinical work is regulated by CLIA, a rigorous laboratory certification standard. Ex. 3 at 42:25-44:3. After "working for over 20 years" to measure proteins in a CLIA-approved manner "because it was so important," GeoMx is "the only" platform Dr. Mills' has been able to use to meet CLIA compliance. Ex. 3 at 44:9-15. Even if Visium could meet Dr. Mills' specific high-plex needs, Visium is not CLIA approved and substituting it "would be breaking the law." Ex. 3 at 44:16-24. Without GeoMx, the tumor boards would be limited to analyzing just 4 or 5 proteins, which would deprive tumor boards of "our most informative piece of information" and is akin to "taking away the third and most important leg" of a three-legged stool. Ex. 3 at 46:5-47:1, 47:20-48:3.

The testimony is reinforced by the declarations. D.I. 328, Exs. 2-23. For example, GeoMx enables high-plex protein analysis with over 570 proteins, compared to Visium's 35-protein product, which is insufficient for detailed biomarker discovery and disease progression analysis. D.I. 328-20 at ¶ 5; D.I. 328-2 at ¶ 7. GeoMx allows researchers to analyze preserved samples without wasting tissue on "prescreening" to ascertain if the sample exceeds Visium's minimum threshold for sample quality. D.I. 328-8 at ¶ 12. And unlike Visium, GeoMx performs nondestructive testing, letting scientists reuse precious tissue samples. D.I. 328-8 at ¶ 9. These examples confirm Visium is not an acceptable substitute for many projects and intended uses.

Although Dr. Smibert hinted that Visium HD could substitute for GeoMx, the transcript does not support this conclusion. Dr. Smibert focused on the recently released Visium HD, which offers a **35-protein** panel—significantly less than GeoMx's **570-protein** panel. Ex. 3 at 94:11-15. Dr. Smibert suggested that even though 10x does not offer a panel with more proteins, researchers could "hack[] together a method" to study additional proteins, although he conceded that "most researchers are not tool builders." Ex. 3 at 95:22-97:13, 102:19-103:1. 10x's counsel did not ask Drs. Dulai or Mills why

6

they did not "hack" Visium to meet their needs. While Dr. Smibert further testified that Visium HD can "measure protein and RNA at the same time," Ex. 3 at 95:1-6, this does not address the significant limitation of Visium's 35-protein panel. Both Visium and GeoMx can measure protein and RNA; the distinction is how many proteins they can analyze on a single slide. The testimony showed that the need for 570 proteins is critical, and Visium cannot do that.

Dr. Smibert's testimony avoided other key concerns raised by Drs. Dulai and Mills. While he described the "high definition of the assay" as the primary improvement for Visium HD, neither Dr. Mills nor Dr. Dulai identified resolution as a relevant concern for their work. Ex. 3 at 97:14-102:21. He noted that Visium HD uses standard glass slides, but this does not resolve Dr. Dulai's concern that Visium's prescreening requirement "exhausts a substantial amount" of scarce tissue. Ex. 3 at 95:17-21; *see id.* at 21:17-22:1. Dr. Smibert never mentioned "prescreening" or otherwise responded to these challenges, nor did he address CLIA-compliance, one of several reasons that Dr. Mills cannot substitute Visium in his cancer trials. Bruker did not question Dr. Smibert because his testimony did not contradict the key testimony of other witnesses or address the matters at issue.

### 3.     10x's Proposed Definition of "Ongoing Research" Is Ambiguous.

The hearing demonstrated that 10x's proposed carve-out for "ongoing research" is confusing and impractical. Both Drs. Dulai and Mills testified about real-world scenarios illustrating the ambiguities and challenges posed by the definition. Ex. 3 at 13:2-23 ("[I]t's unclear to me, if we started an idea two years ago, . . . if we have to move and transition into a new concept or a new idea . . . whether that constitutes ongoing research or new research."), 15:12-16:9 (uncertainty for "follow-up experiment[s]," if others "may want to replicate experiments we've done or may want to collaborate," or if a similar experiment is done in "new populations"), 16:15-17:8 ("What is the definition of ongoing research? How does one determine that it does or does not link to prior work that's done? Is that being

7

reviewed by my peers scientifically, or is that an arbitrary definition?"); *id.* at 48:19-49:11 (confusion about what is considered a new project). Dr. Dulai explained that research often requires adjusting hypotheses or methods based on emerging data, making boundaries difficult to define. Ex. 3 at 13:3-11 ("[B]ased on what we observed with the data, we sometimes need to go in a slightly different direction"). Similarly, Dr. Smibert agreed that while researchers typically submit plans before starting a project, "[t]here's obviously some bounds of uncertainty" in those plans. Ex. 3 at 103:24-105:1.

Drs. Dulai and Mills also testified how 10x's proposed carve-out would disrupt current or very near-future clinical trials. Ex. 3 at 13:12-15:17 (Dr. Dulai explaining why his NIH-funded clinical trial would not fall under carve-out; *see id.* at 129:12-130:7 (10x's counsel confirming that carve-out requires researchers to have purchased consumables before verdict). This includes a new clinical trial in April, involving "tens to hundreds of patients" and eventually expanding to "4,000 patients a year in the near future." Ex. 3 at 58:23-25, 60:15-61:4.[3] Even if these specific projects were permitted, 10x's carve-out would cause "the loss of discovery," disrupt the development of diagnostic tests, and prevent researchers from analyzing old samples that would give insight into how a patient's disease has changed over time. Ex. 3 at 36:2-6, 28:11-30:18.

### 4. GeoMx Sales Plummeted While Visium Sales Grew Significantly.

Unrebutted testimony establishes that GeoMx's market performance declined significantly after the verdict, while Visium's performance improved. Ex. 3 at 63:19-64:3. In 2024, GeoMx sales "very much declined," with only seven GeoMx machines sold worldwide, compared to approximately 270 Visium instruments sold by 10x during the same period. Ex. 3 at 64:4-7, 64:12-22, 65:17-66:1. Ms. Nye explained that customers who can switch to Visium typically do so given the trial outcome.

---

[3] As discussed below, 10x emailed a new proposed definition of "Ongoing Research" today. The doctors had no opportunity to address that definition because of the late notice.

Ex. 3 at 65:14-16. This evidence was unchallenged.

Visium's market growth was corroborated by Dr. Smibert, who testified that customer resistance to adopting Visium has decreased with the recent HD platform launch and its higher resolution. Ex. 3 at 103:8-23. But as Drs. Dulai or Mills explained, doctors and researchers need GeoMx despite the HD capabilities of Visium.

In late 2023, GeoMx released its 570-protein panel, with sales starting in earnest only after trial. Ex. 3 at 83:18, 85:2-13. The hearing showed that customers who remain with GeoMx overwhelmingly rely on its 570-protein panel, as it offers capabilities unmatched by Visium—once again, unrebutted testimony. While Visium supports a 35-protein panel that can be "hacked" to add more proteins, this does not match GeoMx's off-the-shelf high-plex analysis. *See* Ex. 3 at 92:11-13 (a researcher can "sort of hack[] together a method" to add proteins to a panel). Ms. Nye testified that today, "about 74 percent run[ning] the protein panel with the RNA, 2 percent running just protein alone, and the remainder are the RNA." Ex. 3 at 67:13-21. That is, 76% of Bruker's customers use high-plex protein alone or in combination with RNA. This was a "big shift within the market in general." Ex. 3 at 74:5-13. The shift in the market was unrebutted. 10x's argument pointed to evidence at the 2023 trial, but as Ms. Nye pointed out, the circumstances have changed since trial.

This is further supported by the declarations, which predict "significantly" increased use of protein applications "with access to the new protein panel." D.I. 328-2 at ¶ 7; *see also* D.I. 328-8 at ¶ 9 (lab "interested in running a novel IPA/570-plex assay"); D.I. 328-7 at ¶ 5 (570-plex panel "could be a game changer for our work").

     5.    **With a 12.5% Royalty,** ███████████████████████████████.

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

9

██████████████████████████████████████████

████████████████████████████████ This testimony was unchallenged.

## II.	ARGUMENT

### A. Injunction Scope

The Court has broad discretion to craft equitable relief that reflects these post-trial realities while safeguarding public health. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (emphasizing "public consequences").

#### 1.	The Court Should Permit Consumable Sales to Existing Customers.

The scope of the injunction is a matter of public health. The hearing demonstrated the essential role GeoMx plays in patient care and medical research. *Supra* § I.B.1. This includes real-time adjustments to cancer treatments for "real people." Ex. 3 at 37:11-41:2. The hearing established that arbitrary line-drawing around "ongoing research" would disrupt clinical trials and healthcare applications. *Supra* § I.B.3.

The evidence demonstrates that Visium cannot replace GeoMx. *Supra* § I.B.2. There was no actually contradictory testimony. Drs. Dulai and Mills also identified GeoMx's unique ability for high-plex protein analysis. *Supra* § I.B.2. Ms. Nye confirmed that GeoMx customers have overwhelmingly gravitated to its 570-protein panel, with 76% of customers relying on high-plex protein analysis. Ex. 3 at 67:13-21. By contrast, Visium offers a maximum panel of 35 proteins, which is insufficient for many applications. *Supra* § I.B.2 (testimony and declarations). 10x suggested that researchers could "sort of hack[] together a method" to add additional proteins to Visium, but as Dr. Smibert conceded, "most researchers are not tool builders," and he could not identify of any example of "hacking" Visium to exceed 100 proteins. Ex. 3 at 92:11-17, 102:19-103:1. If high-plex capabilities were feasible for Visium, 10x would have already commercialized it.

The facts before the Court differ significantly from those considered by the jury given post-trial events. The 570-protein panel launched just weeks before the verdict, long after discovery closed, and Ms. Nye testified that most customers were unaware of its capabilities at that time. Ex. 3 at 82:17-23, 85:2-13. Today 76% of Bruker's customers rely on high-plex protein analysis, either alone or in combination with RNA, a capability Visium does not and cannot offer. Ex. 3 at 67:13-21. This shift fundamentally alters the equitable considerations. Where non-substitutable sales represented only a small percentage of use cases at trial, it now constitutes the majority. The injunction must account for this post-trial reality and avoid enjoining activities for which no substitute exists.

Bruker's proposed carve-out allows for continued support of GeoMx's installed base as of the injunction, ensuring that existing customers can continue their work without disruption. This approach balances the need to safeguard research and patient care with the reality that GeoMx is a sunsetting product. Market forces will cause customers who can switch to Visium to do so when feasible—they would not stay with a sunsetting product if they can switch. Those who cannot transition due to GeoMx's unique capabilities or for critical patient care would remain for the time being. Ex. 3 at 65:14-16. Bruker's proposed carve-out is clear and easy to administer; there will be no satellite litigation over what constitutes compliance. Bruker's commitment to supplying consumables at a financial loss underscores the gravity of the situation.

10x's latest proposal is another story. After multiple requests, 10x finally sent Bruker a revised carve-out this morning and caveated that further changes may still be made before filing. This 11th hour change is too little too late. The Court instructed the parties to present "all" post-trial issues at the January 23. Bruker presented evidence and the parties argued based on 10x's prior proposal. This last minute rewrite underscores Bruker's point: 10x's carve-out definition remains ambiguous and unworkable. 10x now defines "ongoing research" as "experiments, studies, clinical trials, or grant

11

projects by Existing Instrument Customers that involve the use of GeoMx consumables and that were in-progress before November 18, 2023." But the evidence firmly established that research does not fall within such neat, artificial categories. *Supra* § I.B.3. For example, when is a "grant project" considered "in-progress"? Is it when the application is conceived? Submitted? Approved? Funded? Samples collected? Data collected? Analysis written? Published? Presented? What if the scope, timeline, or subject matter changes, by a little or a lot? 10x's proposal leaves these questions unanswered. Further, any clinical trial that began after the verdict would be stopped mid-study. *See* D.I. 328-12 at ¶¶ 2, 4, 7 (clinical trial involving over 500 cancer patients).

More troubling, as of today, 10x revised the carve-out to include "the sale of consumables to Existing Instrument Customers that are currently using the GeoMx DSP Analysis Instrument in a Laboratory-Developed Test (LDT) consistent with FDA regulations for use in performing such LDT and where such LDT was validated and in use before November 18, 2023." This also falls far short and raises troubling new issues. There is nothing in the record that all of Dr. Mills' LDTs, or other researchers' LTDs, were validated before the verdict. 10x would require the Court to enforce FDA regulations, creating a private cause of action for 10x to litigate FDA compliance. This is not the Court's role. And the Court can no more require compliance with FDA rules than enjoin "infringement," particularly where there has been not trial or claim based on FDA requirements. 10x's revision seems to acknowledge that Dr. Mills' work is life-changing, yet their proposal would still limit its use to LDTs validated before the verdict—excluding any expansion, modification, or replication of the SMMART trials.

All GeoMx data is gathered for the final purpose of patient care, yet 10x ask the Court to draw artificial lines around who gets access to healthcare and who does not. The proposal attempts to exempt Drs. Dulai and Mills but says nothing about the many other scientists and patients around the world

who would be deprived. *Supra* § I.B.2. 10x's proposal would permit some scientists to continue their research, but would prevent any application of those results. For example, if Dr. Mills discovered a cure for cancer using GeoMx, he could not conduct a clinical trial. His work could not be replicated by other scientists. No doctor could administer the treatment to any patient. And exigent circumstances—such as a new pandemic—could not use GeoMx to find solutions.

### 2. Injunctions Must Specify the Enjoined Conduct.

Injunctions cannot enjoin infringement generally, they must identify specific products already found to be infringing. *Int'l Rectifier Corp. v. IXYS Corp.*, 383 F.3d 1312, 1316 (Fed. Cir. 2004). 10x appears to have now conceded this point. *See* Ex. 3 at 132:14-133:2. Further, Rule 65(d)(1)(C) requires that every injunction "describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required." 10x's proposal cannot cite exhibits (much less labeled as Outside Attorneys' Eyes Only) for the accused products.[4]

### 3. Customers and Vendors Should Not Be Subject to the Injunction.

10x demands that Bruker provide a copy of the permanent injunction to all customers and vendors, regardless of whether they have ever used GeoMx. D.I. 373-4 at 5. This is unnecessary and unworkable. It would implicate scores of customers and vendors who do not even have a connection to GeoMx instruments, such as office furniture vendors. Even as to GeoMx customers, the injunction bars Bruker, so customers do not need a copy of it.

### 4. A Broad nCounter Exclusion Is Inappropriate.

10x's proposed injunction improperly seeks to enjoin sales of nCounter to customers who already own a GeoMx instrument, even though nCounter is not independently infringing and has substantial noninfringing uses. D.I. 373-4 at 2. The appropriate language would be to bar nCounter

---

[4] 10x should identify the list of what products it claims to enjoin and the parties should confer.

sales for use <u>in connection with GeoMx instruments</u>.  nCounter is a separate product used for lawful research applications unrelated to GeoMx instruments.  Enjoining nCounter sales solely because a customer owns a GeoMx instrument (perhaps even at a different location) would improperly restrict noninfringing products sold for noninfringing purposes.

### 5.    Compliance

If the Court adopts 10x's restrictive carve-out, the evidence shows that it would be confusing, burdensome, and impractical to require GeoMx customers to provide explanations of how their use complies with the injunction.  Ex. 3 at 16:10-17:8.  10x's approach raises significant concerns, including potential violations of HIPAA, confidentiality obligations, intellectual property rights, and other legal and ethical considerations.  *Id.*  10x's revised proposal is even more unworkable than what 10x argued to the Court—customers would need to explain how their use complies with FDA regulations, with the Court resolving those disputes in satellite litigation.

The more prudent course would be to require Bruker, to the extent needed, to provide reports explaining compliance with the injunction.  Under Bruker's proposed carve-out, minimal compliance process would be required.  Consumable sales would be permitted to the installed base as of the injunction, providing clarity and simplicity.[5]

### B. Ongoing Royalty

The Court should adopt Bruker's proposed 12.5% royalty, as it is the only rate consistent with the evidence and equitable principles.  Ongoing royalties are an equitable remedy.  *See Paice LLC v. Toyota Motor Corp.*, 504 F.3d 1293, 1314-15 (Fed. Cir. 2007).  In setting the rate, the Court must "focus on changed circumstances" and "post-verdict factors," and may consider the *Georgia-Pacific*

---

[5] The parties agree that government sales should be excluded from the injunction.  Ex. 3 at 134:25-135:4 (10x's counsel confirming, "I think that will be agreeable.").

factors. *XY, LLC v. Trans Ova Genetics*, 890 F.3d 1282, 1297 (Fed. Cir. 2018).

The record establishes a significant change in the market post-verdict. *See supra* § I.B.4. ███████████████████████████████████████████████████████████████████ ██████████████████████████ At a 12.5% royalty, Bruker can and will continue to maintain these offerings but would be unable to justify a 25% royalty to its shareholders. Ex. 3 at 111:8-112:14. Public interest can be considered under the *Georgia-Pacific* factors, which account for the profitability of the product (here, ██████), the nature of the invention (critical to healthcare), and the benefits of the invention (supporting research and patient care). 10x's proposal would result in an ██████████████, a rate no rational party would accept in a hypothetical negotiation. And importantly, the Court may consider the public interest in issuing an injunction, of which the royalty rate is a part.

This is not an issue of avoiding payment. Bruker is prepared to pay a fair royalty, but the rate must balance compensation for 10x with the need to ensure researchers and clinicians retain access to GeoMx. A royalty of no more than 12.5% achieves this balance.

### C. Supplemental Damages

The Court should award lost profits based on profits that 10x actually lost, not speculative or hypothetical numbers. Both parties agree on the actual supplemental lost profits incurred by 10x. 10x's calculation inflate those lost profits by $1 million, applying a profit rate to hypothetical sales that did not occur. The correct supplemental lost profits number is ██████████, as reflected in Schedule 1B of D.I. 376-1.

### III. CONCLUSION

Bruker respectfully requests that the Court issue the proposed order in Exhibit 1.

15

Dated: January 28, 2025

Christine E. Lehman (admitted *pro hac vice*)
Adam Adler (admitted *pro hac vice*)
REICHMAN JORGENSEN LEHMAN & FELDBERG LLP
1909 K Street NW, Suite 800,
Washington, DC 20006
Tel: (202) 894-7310
Bruker-10X@reichmanjorgensen.com

Sarah Jorgensen (admitted *pro hac vice*)
REICHMAN JORGENSEN LEHMAN & FELDBERG LLP
1201 West Peachtree Street, Suite 2300,
Atlanta, GA 30309
Bruker-10X@reichmanjorgensen.com

Courtland L. Reichman (admitted *pro hac vice*)
Savannah H. Carnes (admitted *pro hac vice*)
REICHMAN JORGENSEN LEHMAN & FELDBERG LLP
100 Marine Parkway, Suite 300,
Redwood Shores, CA 94065
Bruker-10X@reichmanjorgensen.com

Edward R. Reines (admitted *pro hac vice*)
Derek C. Walter (admitted *pro hac vice*)
Karnik F. Hajjar (admitted *pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, CA 94065
Tel: (650) 802-3000
Fax: (650) 802-3100
NanoString.10X@weil.com

Amanda Branch (admitted *pro hac vice*)
Christopher Pepe (admitted *pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
2001 M Street, NW, Suite 600
Washington, DC  20036
NanoString.10X@weil.com

Natalie C. Kennedy (admitted *pro hac vice*)

Respectfully submitted,

FARNAN LLP

*/s/ Brian E. Farnan*
Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
919 North Market St., 12th Floor
Wilmington, DE 19801
Tel: (302) 777-0300
Fax: (302) 777-0301
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

*Attorneys for Defendants*

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153-0119
NanoString.10X@weil.com